1  ELIZABETH A. BROWN (SB# 235429)
   CLAIRE A. HOFFMANN (SB# 292584)
2  lisabrown@gbgllp.com
   clairehoffmann@gbgllp.com
3  GBG LLP
   601 Montgomery Street, Suite 1150
4  San Francisco, CA 94111
   Telephone: (415) 603-5000
5  Facsimile: (415) 840-7210

6  Attorneys for Petitioner
   PACIFIC BELL TELEPHONE COMPANY
7

8                     UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  PACIFIC BELL TELEPHONE COMPANY,        Case No.

12              Petitioner,                 **DECLARATION OF JEFFREY
                                            ROBERTSON IN SUPPORT OF
13       vs.                                PETITIONER PACIFIC BELL
                                            TELEPHONE COMPANY'S PETITION
14  COMMUNICATIONS WORKERS OF               TO VACATE ARBITRATION AWARD**
    AMERICA, LOCAL 9412, AFL CIO,
15  Employee Organization,

16              Respondent.

17  ─────────────────────────────

18  JAMES MULVANEY, an individual,

19              Real-Party-In-Interest.

20

21

22

23

24

25

26

27

28

1    I, Jeffrey Robertson, hereby declare as follows:

2    1.    I am currently employed by AT&T Services, Inc., in the position of Lead Labor

3    Relations Manager.  I have been in Labor Relations since May 1, 2003.  AT&T Services, Inc.

4    provides certain support functions to affiliated companies, including Pacific Bell Telephone

5    Company ("Pacific Bell").  Pacific Bell is a subsidiary of AT&T, Inc., that provides and

6    maintains both wired and wireless telecommunications networks in California.  Unless otherwise

7    indicated, I have personal knowledge of the matters set forth in this declaration.  If called as a

8    witness, I could and would testify competently to the facts stated herein.

9    2.    I make this declaration in support of Pacific Bell Telephone Company's Petition to

10   Vacate Arbitration Award.

11   3.    As part of my job duties as Lead Labor Relations Manager at AT&T Services,

12   Inc., I have access to certain of Pacific Bell's business records that are prepared in the ordinary

13   course of business and which relate to Pacific Bell's employees.  These business records include,

14   among other things, employee personnel and labor relations data.  I regularly use and rely upon

15   these business records in the course of performing my job duties.

16   4.    Pacific Bell employs Splicing Technicians to install and maintain wires, cables,

17   and other components of Pacific Bell's telecommunications equipment.  James Mulvaney

18   ("Mulvaney") worked as a Splicing Technician for Pacific Bell at all times relevant to the

19   Petition.  The Splicing Technician position may require the ability to lift up to 100 pounds.  The

20   position may also require climbing poles and ladders.  Splicing Technicians employed by Pacific

21   Bell are unionized as part of the Communication Workers of America, and the terms of their

22   employment are governed by a Collective Bargaining Agreement.   Relevant excerpts from the

23   Collective Bargaining Agreement applicable to Pacific Bell Splicing Technicians is attached

24   hereto as Exhibit A.

25   5.    In 2012, claiming various medical injuries including to his shoulder and other

26   issues, Mulvaney filed two workers' compensation claims.  Mulvaney was represented by legal

27   counsel in his workers compensation claims.  The parties to the workers' compensation

28

1  proceedings agreed to use an Agreed Medical Evaluation ("AME") to resolve all medically

2  related issues.  On November 21, 2013, Dr. Robert Bruckman issued a report ("2013 AME

3  Report") finding that Mulvaney had reached permanent and stationary status.  A true and correct

4  copy of the 2013 AME Report is attached hereto as Exhibit B.

5          6.      In March 2016, the parties in the workers' compensation case settled Mulvaney's

6  claim regarding his shoulder on the basis of the 2013 AME Report.  A true and correct copy of

7  the March 25, 2016 order approving the settlement is attached hereto as Exhibit C.

8          7.      In April 2016, Mulvaney informed an acting supervisor at Pacific Bell that a work

9  assignment he received conflicted with work restrictions from his workers' compensation claim.

10  Mulvaney's acting supervisor was unaware that Mulvaney had any work restrictions and

11  contacted the AT&T Integrated Disability Service Center ("IDSC") pursuant to Pacific Bell's

12  procedures for work restrictions and accommodations. The IDSC is a third-party claims-

13  management service that administers, claims for workers' compensation, short term disability

14  benefits, and other disability-related claims.  IDSC informed Mulvaney's manager the 2013 AME

15  Report set forth a permanent work restriction to Mulvaney's shoulder that would make it

16  "difficult or impossible for him to work at or above the shoulder level indefinitely."  Mulvaney's

17  manager determined that Mulvaney's work restriction prevented him from performing the

18  essential functions of the Splicing Technician position.  Pacific Bell placed Mulvaney on an

19  unpaid leave of absence as an accommodation.  A true and correct copy of the excerpt of IDSC

20  records regarding these events is attached hereto as Exhibit D.

21          8.      On April 15, 2016, Mulvaney's union representative provided Pacific Bell with a

22  medical note dated April 14, 2016, from Dr. Grewal at the Tracy Medical Group in Tracy,

23  California.  A true and correct copy of the April 14, 2016 note from Dr. Grewal is attached hereto

24  as Exhibit E.

25          9.      On August 5, 2016, Dr. Bruckman issued a new report.  A true and correct copy of

26  the August 5, 2016 report from Dr. Bruckman is attached hereto as Exhibit F.  Pacific Bell

27

28

1  received this report from IDSC on September 2, 2016.  On September 6, 2016, Mulvaney

2  returned to work with no restrictions.

3          10.      On September 13, 2016, CWA Local 9412 (the "Union") submitted a Step 1

4  Grievance Meeting Request on behalf of Mulvaney.  A true and correct copy of the Step 1

5  Grievance Meeting Request is attached hereto as Exhibit G.

6          11.      On October 6, 2016, the Union submitted a Step 2 Grievance Meeting Request.  A

7  true and correct copy of the Step 2 Grievance Meeting Request is attached hereto as Exhibit H.

8          12.      A true and correct copy of the Final Company Position, dated May 2, 2017, is

9  attached hereto as Exhibit I.

10          13.      On May 31, 2017, Ameena Salaam, the Assistant to the Vice President of CWA

11  District 9, sent a letter to Pacific Bell's Director Labor Relations stating the union's intent to

12  arbitrate the grievance.  A true and correct copy of the May 31, 2017 Notice of Intent to Arbitrate

13  is attached hereto as Exhibit J.

14          14.      On September 18, 2018, Arbitrator Katherine J. Thompson held an evidentiary

15  hearing in San Ramon, California.  At the hearing, the parties stipulated that the issue to be

16  determined was "[w]hether the Union's notice of intent to arbitrate sets forth an issue that is

17  subject to arbitration."  On September 25, 2018, Arbitrator Katherine J. Thomson issued the

18  Arbitrator's Award.  A true and correct copy of the September 25, 2018 Award is attached hereto

19  as Exhibit K.

20          I declare under penalty of perjury under the laws of the United States and the State of

21  California that the foregoing is true and correct.

22          Executed on the 3rd day of January 2019, at San Ramon / California.

23

24                                            _____

25                                            JEFFREY ROBERTSON

26

27

28

---

Case No. _____                    -3-                    DECL. OF JEFFREY ROBERTSON ISO
                                                                    PETITIONER'S PETITION TO VACATE
                                                                    ARBITRATION AWARD

88666919.1

Exhibit A

# 2016
# CONTRACT



**Communications Workers of America**



**Pacific Bell Telephone Company**

**Nevada Bell Telephone Company**

**AT&T Services, Inc.**

**SBC Global Services, Inc.**

**DIRECTV, LLC**

**Effective April 10, 2016**
**Expiration Date April 4, 2020**



## PREAMBLE

Pursuant and in consolidation of the terms agreed to in the Memorandum of Agreement executed on *July 12, 2017* this consolidated Contract is signed on this *12th* day of *July 2017*, between Pacific Bell Telephone Company, Nevada Bell Telephone Company, AT&T Services, Inc., SBC Global Services, Inc. and *DIRECTV, LLC*, hereinafter collectively referred to as the "Companies," and the COMMUNICATIONS WORKERS OF AMERICA, hereinafter referred to as the "Union."

The respective parties to this consolidated Contract do mutually agree and covenant as follows:

## ARTICLE 1

## RECOGNITION

**Section 1.01**   The Companies recognize the Union as the exclusive collective bargaining representative for those employees having the occupational title classifications outlined in Appendices A, D, and E for the collective bargaining units described in the Agreement of Recognition.

**Section 1.02**   Nothing herein shall be construed as authorizing the inclusion of any employee or employees not properly includable in the above described bargaining unit, nor shall be construed as a waiver or forbearance on the part of the Union of any right to represent any employee or employees properly includable in such bargaining unit as contemplated under the National Labor Relations Act as now or hereafter amended or superseded.

**Section 1.03**   Additions to, or changes in, recognition as described in the Agreement of Recognition may be made by mutual agreement.

**Section 1.04**   The Companies recognize the Union or its authorized representatives as having sole power to execute agreements with the Companies in regard to rates of pay, wages, hours of employment and other conditions of employment affecting the employees in the collective bargaining units described in the Agreement of Recognition.

**Section 1.05**   The Companies will furnish a copy of the Contract to all employees.

PREAMBLE
ARTICLE 1

1

## ARTICLE 3

### COMPANY-UNION RELATIONS

**Section 3.01**

The Companies and the Union recognize that it is in the best interests of both parties, the employees and the public that all dealings between them continue to be characterized by mutual responsibility and respect.  To insure that this relationship continues and improves, the Companies and the Union and their respective representatives at all levels will apply the terms of this Contract fairly in accord with its intent and meaning and consistent with the Union's status as exclusive bargaining representative of all employees covered by this Contract.  Each party shall bring to the attention of all employees in the units covered by this Contract, including new hires, their purpose to conduct themselves in a spirit of responsibility and respect and of the measures they have agreed upon to insure adherence to this purpose.

**Section 3.02**        **MEETINGS BETWEEN UNION AND MANAGEMENT REPRESENTATIVES**

**A.**    An Officer of the Communications Workers of America National Union shall furnish currently to the Companies written lists of its duly authorized bargaining representatives and other persons authorized to represent the Union.  The Companies shall likewise notify the Union of its authorized bargaining representatives.  The Secretary or Secretary-Treasurer of each Local shall furnish currently to the Companies written lists of its representatives authorized to present and process grievances, subject to the approval of the Union.

**B.**    Except as provided in Section 3.04A, Paragraph B4 of this Section and in Section 3.02C, authorized representatives of the Union who are employees covered by this Contract, and aggrieved employees who also are covered by this Contract, shall suffer no loss of pay at straight-time when attending meetings with the Companies' representatives when such meetings pertain to matters relating to employees *employed by the Companies or their affiliates who are* represented by the Communications Workers of America, subject to the following conditions:

   **1.**    Pay shall be allowed only if (1) the employee has been excused from duty in advance by the employee's supervisor to attend the meeting, (2) such meeting is held during said employee's scheduled straight-time working hours, (3) said employee would have worked had the employee not attended such meeting and (4) such meeting pertains to matters relating to employees of the Companies represented by the Communications Workers of America.

**ARTICLE 3**

**2.** The time paid for shall be limited to actual meeting time, plus necessary time, if any, spent during scheduled straight-time working hours in traveling between the employee's point of work and the Union-Management meeting where both locations are within the same city. When both locations are not within the same city, paid travel time shall not exceed two (2) hours in each direction.  For the purposes of this Paragraph the cities of Los Angeles and San Diego shall be deemed to include their respective extended areas.

**3.** Paid time spent attending Union-Management meetings for purposes other than negotiating a written contract, and paid time spent by authorized Local representatives in attending grievance meetings, shall be considered as time worked.

Such time spent in attending Union-Management meetings, as referred to in this Paragraph, shall be considered as excused time off for Union activities for the purposes of Article 3, Section 3.03.

**4.** The Companies reserve the right to limit the number of employees who shall be paid while attending Union-Management meetings.   The number of employees so paid at grievance meetings is specified in Article 7, Problem Resolution Procedures.

**C.** When a Union-Management meeting ends a reasonable time prior to the completion of scheduled working hours, an employee who would be working if not attending such meeting, shall return to work.

**D.** For meetings  other than those specified in Section 3.04A or in Article 7, up to two (2) authorized representatives from each Union Local who are employees covered by this Contract, and who are required, in the judgment of the Companies, to stay overnight may, with prior management approval, receive reimbursement for reasonable travel and lodging expenses actually incurred in association with attending meetings with the Companies' representatives when such meetings pertain to matters relating to employees represented by the Communications Workers of America, subject to  the following conditions:

**1.** Reimbursement shall be allowed only if (1) the employee has been excused from duty in advance by the employee's supervisor to attend the meeting, (2) such meeting is held during said employee's scheduled straight-time working hours, (3) said employee would have worked had the employee not attended such meeting and (4) no expense payment other than that provided for in 3.02F is granted to the employee.

**Section 3.02.D (continued)**

    **2.**      If a meeting with the Companies' representatives is held on the employee's non-scheduled day during a normal workweek, the expense reimbursement specified in Section 3.02D will be granted even though conditions 2 and 3 in Section 3.02D1 are not met.

    **3.**      Union Local Presidents, who are employees covered by this Contract, and who are on unpaid Union activity time, are eligible to receive the payment specified in this Section 3.02D even though conditions 2 and 3 in Section 3.02D1 are not met.

    **4.**      Mileage will be reimbursed in accordance with Article 5, Section 5.05C4.

**E.**      For meetings  other than those specified in Section 3.04A or in Article 7, up to two (2) authorized representatives from each Union Local who are employees covered by this Contract, and who, in the judgment of the Companies, are  not required to stay overnight may, with prior management approval, receive actual expense reimbursement for travel when such travel expense is incurred in   association with attending meetings with the Companies' representatives when such meetings pertain to matters relating to employees represented by the Communications Workers of America, subject to the following conditions:

    **1.**      Reimbursement shall be allowed only if (1) the employee has been excused from duty in advance by the employee's supervisor to attend the meeting, (2) such meeting is held during said employee's scheduled straight-time working hours, (3) said employee would have worked had the employee not attended such meeting and (4) no other expense payment is granted to the employee.

    **2.**      If a meeting with the Companies' representatives is held on the employee's non-scheduled day during a normal workweek, the expense reimbursement specified in Section 3.02E will be granted even though conditions 2 and 3 in Section 3.02E1 are not met.

    **3.**      Union Local Presidents, who are employees covered by this Contract, and who are on unpaid Union activity time, are eligible to receive the payment specified in this Section 3.02E even though conditions 2 and 3 in Section 3.02E1 are not met.

    **4.**      Mileage will be reimbursed in accordance with Article 5, Section 5.05C4.

**F.**      Union representatives who are eligible to receive reimbursement as specified in Section 3.02D may receive *a per diem* of *forty-two* dollars (*$42.00*) per day when meals are not provided by the Companies.

**ARTICLE 3**

**Section 3.03**        **TIME OFF FOR UNION ACTIVITIES**

**A.    GENERAL**

  **1.**    To the extent that the Companies determine that the requirements of the service permit, an employee who is an authorized representative of the Union and who is covered by this Contract will be given an excused absence without pay, or a leave of absence without pay, subject to the conditions stated hereafter.  Such time off will generally not be granted in cases where an overtime or premium rate would have to be paid to the employee or employees replacing the Union representatives.  As used in this Article the terms "excused absence" and "leave of absence" are defined as follows:

  • EXCUSED ABSENCE - An unpaid absence not exceeding thirty (30) consecutive calendar days.

  • LEAVE OF ABSENCE - An unpaid absence of over thirty (30) consecutive calendar days covered by a written leave of absence.

  **2.**    The period of excused absence shall be used solely for the purpose of enabling authorized representatives of the Union to carry on activities of the Union directly concerning its relations with   the Companies in connection with employees of the Companies covered by this Contract, except that the period of absence may be used to attend, for short periods of time, national or regional conventions or meetings of the Union.

  **3.**    The period of leave of absence shall be used for the purpose of enabling authorized representatives of the Union to carry on activities of the Union concerning its relations with the Companies in connection with employees of the Companies represented by the Union, within the States or portions of States served by the Companies, except that,

  **a.**    the period of absence may be used to attend national or regional conventions or meetings of the Union, and

  **b.**    the period of absence may be used by not more than seventy-five (75) employees at any one time in serving as officers or representatives of the Union outside the territory described in 3 above, and

  **c.**    the period of absence may be used by not more than forty (40) employees at any one time to carry on activities of the Union concerning employees of other telephone companies represented by the Union or not represented by any Union, within the States or portions of States served by the Companies.

**Section 3.03.A (continued)**

    **4.** A maximum of thirty (30) authorized representatives of the Union at any one time may use periods of excused time off or leave of absence for such other activities as may be agreed to by the Companies.

    **5.** Requests for leaves of absence for Union activities shall be made in writing by the appropriate Officer of the National Union directing District 9 of the Union or the Union's authorized representative, specifying the reasons for such leaves.

    **6.** It is agreed that the Companies have the right to terminate a leave of absence at any time if it is used for purposes other than those specified in the written application.

    **7.** Requests for excused absence shall be made by the Union representatives authorized for such purpose in writing to the appropriate Labor Relations Director, by the appropriate Officer of the National Union directing District 9 of the Union. Such requests may also be made by any of the three (3) principal Officers of a Local. The Secretary or Secretary-Treasurer of each Local shall furnish a list of such Local Officers to the appropriate Labor Relations Director and shall furnish amendments to such lists as changes are made.

    **8.** The Union shall make all requests for excused absences or leaves of absence as far in advance as possible, ordinarily not less than forty-eight (48) hours in advance of the time the employee is to be off on excused absence and ordinarily not less than two (2) weeks in advance of the start of a leave of absence or renewal of same; the Companies shall act promptly on each request.

    **9.** No payment shall be made to an authorized Union representative for time spent in meetings with the Companies' representatives while the Union representative is on an excused absence or leave of absence.

    **10.** No employee shall take time off for Union activities unless excused in advance by supervision.

**B.   EXCUSED ABSENCES**

    **1.** The total of all excused absences granted to an authorized Union representative in each calendar year shall not exceed one hundred twenty (120) scheduled working days, or the equivalent thereof, in full days and/or fractional days. However, not more than one hundred fifty (150) authorized representatives of the Union may be granted excused absences not to exceed one hundred eighty (180) scheduled working days, or the equivalent thereof, in full days and/or fractional days.

**ARTICLE 3**

**2.** A single period of excused absence shall not exceed thirty (30) consecutive calendar days.

**3.** Meeting with the Companies' representatives during a period of excused absence shall not be considered as breaking a continuous period of absence.

**4.** Excused absences under this Section will be considered as time-worked for purposes of FMLA eligibility.

> NOTE: The provisions of this Section 3.03B will not apply to an employee who accepts a Staff position with the Communications Workers of America (CWA).

## C.  LEAVES OF ABSENCE

**1.** A leave of absence will be required:

    **a.** If a continuous period of absence for Union activity exceeds thirty (30) consecutive calendar days.

    **b.** If an employee who is an authorized representative of the Union is to have time off for Union activities in excess of ninety (90) or one hundred fifty (150) scheduled working days computed as specified in Section 3.03B.

    **c.** As of April 1, 2001, if an employee, who is an authorized representative of the Union, accepts a Staff position with the Communications Workers of America.

**2.** If a leave of absence is granted because an employee's excused absences have exceeded one hundred twenty (120) or one hundred eighty (180) days computed as specified in Section 3.03B, the leave of absence shall be for a period beginning with the first scheduled working day after the last day worked and shall be for a period of not less than thirty-one (31) days.

**3.** If the leave of absence is granted because an employee accepts a Staff position with the CWA, other than for a short-term temporary backfill, the leave of absence will be for a period beginning with the first scheduled working day after the effective date of the CWA employment and will not be for a period of less than thirty-one (31) calendar days. The employee must remain on the leave of absence until one of the following occurs:

**Section 3.03.C.3 (continued)**

> **a.** The employee's Staff position with the CWA is concluded and the employee notifies the Companies, in accordance with Section 3.03D, of his/her intent to return to work within the time allowed under Section 3.03C7 of this agreement.
>
> **b.** The employee would exceed the Union Leave of Absence time allowed under Section 3.03C7 of this agreement, at which time the employee would notify the Companies, in accordance with 3.03D, of his/her intent to return to work or terminate his/her employment with the Companies.

**4.** The general rules of the Companies governing leaves of absence for personal reasons shall apply except as changed herein.

**5.** At no time shall more than one hundred (100) employees be on leave of absence under this Article.

**6.** A leave of absence for Union activities or an extension of such a leave shall be for a period of not more than one (1) year each.

**7.** The total cumulative period of leave-of-absence for Union business shall not exceed twenty-one (21) years, all of which shall be counted as service credit in terms of employment. The payment of premiums for continuation of standard fringe benefits during a leave of absence for Union business shall be as follows:

> Medical/Dental/Vision…….Companies pay
>
> Group Insurance……………Companies pay
>
> Pension Band……………....Will be determined by the employee's last title and wage area prior to the start of the most recent leave of absence for Union business updated to current comparable title and wage area.

**8.** In computing an employee's net credited service for all purposes except wage progression, full credit shall be allowed for periods of leaves of absence for Union activities not exceeding twenty-one (21) years in the aggregate during the employee's total service life. No credit for any purpose shall be allowed for such leaves in excess of twenty-one (21) years, nor shall credit be allowed for wage progression purposes for any period covered by leaves of absence granted pursuant to Section 3.03.

**ARTICLE 3**

39

**9.** When the period of a leave of absence for Union activities is to be included in computing an employee's net credited service, the employee shall retain eligibility, if any, according to term of service, to:

    **a.** Death Benefits, and

    **b.** Short-Term Disability Benefits.

    In determining such employee's eligibility to sickness disability benefits, the first day following termination of the leave of absence shall be considered as the first day of absence because of sickness.

**10.** A leave of absence granted under this Article shall automatically terminate if at any time the employee on leave engages in any gainful occupation other than as a representative of the Union or if the employee ceases to function as an authorized representative of the Union.

## D. REINSTATEMENT OF EMPLOYEE UPON RETURN FROM ABSENCE

**1.** Authorized Union representatives upon return from excused absences or leaves of absence shall be reinstated at work generally similar to that which they were engaged last prior to their absence, subject, however, to the provisions of Section 2.04B1a.

**2.** Employees shall be placed on the payroll at the rate then in effect for their assignment and for the period of service which was credited to them for wage purposes at the start of their absence.

**3.** After receipt of notice from an employee to the Companies stating the desire to terminate an excused absence or leave of absence prior to the specified termination date, the leave will be terminated upon the employee's return to work as instructed by the Companies. However, a leave shall be terminated at the request of the employee prior to its stated expiration date as provided in this Paragraph only in case the employee is able on the day of return to perform, on a full-time basis, the duties required of such an employee.

**Section 3.04**      **COLLECTIVE BARGAINING MEETINGS BETWEEN UNION AND MANAGEMENT REPRESENTATIVES**

**A.**      The Companies will compensate up to four (4) authorized representatives of the Union, who are active employees covered by this Contract, for attending meetings with Management for the purpose of negotiating a written Contract. This compensation will be at the employee's basic straight time wage rate for scheduled workdays only and will not include any differential payments. The total days paid by the Companies for each employee will not exceed fifty (50). The expenses of all Union representatives will be borne by the Union. Time spent in attending meetings with Management under this Section will not be considered time worked, except for the purpose of FMLA eligibility.

**Section 3.05**      **UNION ACTIVITIES ON THE COMPANIES' PREMISES**

**A.**      Authorized representatives of the Union may be granted access to the Companies' premises where employees covered by this Contract are located upon application to the appropriate Company supervisor at the location in question, subject to the Companies' practices and the requirements of Government regulations.

**B.**      The Union or its members shall not carry on any type of Union activities on the Companies' premises, except as provided in Section 3.05C, unless advance approval has been given by appropriate Company supervision for such activities. The Companies reserve the right to curtail or prohibit any Union activity on any premises of the Companies when, in their judgment, such activity is not in accordance with the approval granted by appropriate Company supervision as provided in this Section 3.05B.

**C.**      Union activities involving the solicitation of members on the Companies' premises shall be carried on only in accordance with the following:

   **1.**      Union representatives may solicit members among employees of the Companies in the Areas now represented by this Union.

   **2.**      Such solicitation shall only be made during periods when neither the Union members nor the employees being solicited are on Company time, excluding paid rest and meal periods.

   **3.**      Such solicitation shall not be carried on in space where the Companies' operations or administrative work is being performed.

   **4.**      Such solicitation shall be limited to small groups of employees (not to exceed four (4)).

   **5.**      Such solicitation shall not interfere with the operations of the Companies or the use of the space for the purposes for which the space is intended.

**ARTICLE 3**

**Section 3.05 (continued)**

**D.**     Authorized representatives of the Union may attend Union-Management meetings for the purposes of collective bargaining and discussing grievances presented to the Union by employees covered by this Contract when such meetings have been suitably arranged for in advance.

**Section 3.06          BULLETIN BOARDS**

**A.**     Upon written request from the Union, the Companies agree to install or to move bulletin boards for the exclusive use of the Union.  Bulletin boards and their designations shall be provided by the Union and shall be in accordance with the Companies' specifications.  The size of the bulletin boards shall be approximately 18" x 36", 24" x 36" or 12" x 24" in dimensions.  The number and location of bulletin boards shall be determined jointly by the Companies and the Union with due regard to visibility and accessibility to employees for whom the Union is the recognized representative.  Each bulletin board shall be designated specifically as follows:

UNION BULLETIN BOARD
Local (Number), Communications Workers of America

Letters in such designation shall not be over 1-1/2" high.  The overall size of the designation shall not extend beyond the bulletin board itself, or be more than 24" long by 2" high, and shall be in a horizontal position within 3" of the top of the bulletin board.

**B.**     Unless otherwise agreed upon in advance by the Companies, the Union agrees not to post or distribute Union material any place on the Companies' premises other than on Union bulletin boards.  Unless otherwise agreed upon in advance by the Companies, the Union also agrees that Union bulletin boards shall be used solely for notices and announcements concerning Union meetings, elections, appointments to office, social, educational, or recreational affairs and agreements concluded between the Union and the Companies.  Posted notices and announcements shall be appropriately identified as Union material intended for posting and shall ordinarily bear the signature of an authorized representative of the Union.  Should the Union desire to post subject matter other than the material specified above, it shall obtain advance approval from the Companies before such subject matter is posted.

**C.**     Material posted shall not contain anything controversial or anything derogatory to the Companies or any of their employees.  The Union assumes responsibility for complete compliance with the provisions herein contained.  Should the Union post material which, in the judgment of the Companies, is at variance with the spirit and intent of this Section, such material shall be immediately removed by the Union upon notification by the Companies.

**D.**     If the Union violates any provision of Section 3.06B or Section 3.06C, the Companies, after giving due notice of such violation, may deny the right of the Union to use any or all bulletin boards on the Companies' premises, and may remove any or all such bulletin boards.

**Section 3.07       UNION SECURITY**

**A.**     Each employee who is a member of the Union or who is obligated to tender to the Union amounts equal to periodic dues on the effective date of this Contract, or who later becomes a member, and all employees entering into the bargaining unit on or after the effective date of this Contract shall, as a condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members for the period from such effective date or, in the case of employees entering into the bargaining unit after the effective date, on or after the thirtieth day after such entrance, whichever of these dates is later, until the termination of this Contract.  For purpose of this Section, "employee" shall mean any person entering into the bargaining unit, except an Occasional employee.

**B.**     Each employee who is a member of the bargaining unit on or before the effective date of this Agreement and who on the effective date of this Agreement was not required as a condition of employment to pay or tender to the Union amounts equal to the periodic dues applicable to members shall, as a  condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members for the period beginning thirty (30) days after the effective date of this Agreement, until the termination of this Agreement.

**C.**     The condition of employment specified above shall not apply during periods of formal separation from the bargaining unit by any such employee but shall reapply to such employee on the thirtieth day following the employee's return to the bargaining unit.  The term "formal separation" includes transfers out of the bargaining unit, removal from the payroll of the Companies and leaves of absence of more than one month duration.

**D.**     The Companies may inform employees and applicants for employment of their rights and obligations under the provisions of this Section.

**E.**     This Section shall apply only in the State of California on the effective date of this Contract.  If during the term of this Contract the Union shall become duly authorized under the laws of the State of Nevada to enter into this type of union security agreement, the effective date of this Section as to employees in Nevada shall be the date upon which the Companies receive proper written evidence from the Union that it is fully qualified to enter into such an agreement in Nevada.  Upon proper written notification that the Union is qualified to enter into a union security agreement, this entire Section will become applicable to employees in Nevada.

**ARTICLE 3**

**Section 3.08**          **PAYROLL DEDUCTION OF UNION DUES**

**A.**     The Companies agree that, upon receipt of an individual written request on a form approved by the Companies and signed by an employee covered by this Contract, they will deduct monthly from such employee's wages the amount of Union dues specified in such request and forward the full amount thus deducted to the Secretary-Treasurer of the Union or the Union's authorized agent as directed.

  **1.**     For all employees of the Companies in California*,* the request may be revoked at any time upon the employee's written request to the Company and such request should be directed to the Labor Relations Director, San Ramon, as appropriate.  For employees of the Companies in Nevada, cancellation of payroll deduction authorizations will be made as specified in Section 3.08E.

  **2.**     In general, dues deductions will be made in a designated pay-period in the current month for properly executed dues deduction authorizations received in the appropriate Accounting Center on or before the fifth day of the preceding month.  However, the Companies assume no responsibility either to the employee or to the Union for any failure to make or for any errors made in making such deductions, but will make such efforts as they deem appropriate in correcting any such errors or omissions.

**B.**     Authorizations for dues deductions shall be "open-ended" to provide for the deduction of dues in an amount which is certified to the Companies in writing by the Secretary-Treasurer of the Union as being the regular monthly membership dues of the particular Local involved.  The form of such individual authorization card shall be as approved by the Companies.

**C.**     The written certification changing the amount of dues to be deducted must be delivered to the Executive Director - Labor Relations on or before the fifth work day of the month preceding the month in which the first deduction at the new rate is to be made effective, together with a list of the work locations and Union Local affected by the change.

**D.**     The Companies agree to furnish the Union at the time of remitting the dues deducted, a list, on magnetic tape, of the names of those employees represented by the Union and the amount of dues deducted.  The content and form of other employee information to be furnished to the Union on magnetic tape shall be such as agreed upon by the parties from time to time.

**E.**     The following Section applies only to employees in Nevada.  Authorizations for dues deductions executed pursuant to Article 3.08A after August 6, 1989 shall specify that dues deductions may be revoked only within the fourteen (14) day period immediately prior to each anniversary of the current Collective Bargaining Agreement or during the fourteen (14) calendar days prior to the termination date of the Collective Bargaining Agreement.

<u>**Section 3.08 (continued)**</u>

Cancellations by employees of such written payroll deduction authorizations must be in writing and such cancellation requests must be sent individually by certified mail to the Labor Relations Director, San Ramon, postmarked or received during the fourteen (14) day period described in 3.08E.  After receipt of such cancellation the Company will discontinue the payroll deduction in the month following that in which the cancellation is received and will notify the Union of the action taken.

**F.**     Cancellation of dues deduction authorizations will be made by the Companies on the permanent transfer or promotion of an employee to an ineligible position effective the first payroll period following the transfer or promotion and the Companies will notify the Union of such cancellation.

**G.**     It is agreed that the payroll deduction of Union dues shall be in lieu of Union collection of dues, assessments and contributions on the Companies' premises where work operations are being performed and while Union representatives and/or the employees involved are on Company time.

**H.**     The Union shall indemnify and hold the Companies harmless against any and all claims, demands, suits, or other forms of liability that may arise out of or by reason of action taken or not taken by the Companies for the purpose of complying with the provisions of this Article, or in reliance on any dues deduction card furnished under the provisions of this Article or on any certification by the Union.

**Section 3.09          NON-DISCRIMINATION**

**A.**     In a desire to restate their respective policies, neither the Companies nor the Union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, age, marital status, sexual orientation, or national origin or because the person is disabled, a special disabled veteran, a disabled veteran or a veteran of the Vietnam era.

**ARTICLE 3**

<u>Section 3.09 (continued)</u>

**B.**     The Companies and the Union recognize that potential conflicts may arise between obligations under the Americans With Disabilities Act (ADA) and the terms of the Contract.  In order to minimize disputes between the Companies and the Union due to any  such potential conflicts and to ensure timely resolution, the parties agree that all issues regarding actions which the Companies believe to be consistent with the ADA and the Union believes to be in conflict with the Contract will be referred to and addressed by a National Union Representative, a representative from the affected Union Local, the Labor Relations Director (or authorized representative) and a representative from the affected Company department ("ADA Liaison Committee").

        **1.**     The ADA Liaison Committee is empowered to resolve any issues or problems regarding a potential conflict between obligations under the ADA and the terms of this Contract.

        **2.**     Agreements made by the ADA Liaison Committee will not prejudice the position of either party and will not be cited in any other proceeding. Such agreements will not be subject to the grievance and arbitration process.

        **3.**     Unresolved issues or problems regarding potential conflicts will not delay or defer the Companies' actions.  If the ADA Liaison Committee is unable to resolve a dispute, the issue(s) regarding appropriate actions under the ADA and the Contract may then be addressed under the arbitration provisions of the Contract.  To ensure timely resolution of such disputes, the grievance procedure shall be bypassed and the matter may be submitted directly to arbitration.

**C.**     It is mutually agreed that neither party shall interfere with, restrain, coerce, or otherwise discriminate against employees in their right to join or assist, or refrain from joining or assisting, any labor organization.

**D.**     The Companies shall not interfere with, restrain, coerce, intimidate or otherwise discriminate against any employee because of membership or lawful activity in forwarding the interests or purposes of the Union.

**Section 3.10          FEDERAL OR STATE LAWS**

In the event any Federal or State law or regulation or governmental order, or the final decision of any court or board of competent jurisdiction affects any one or more provisions of this Contract, the provision or provisions so affected shall be made to comply with the requirements of such law, regulation, governmental order, or decision for the localities within the jurisdiction and otherwise the Contract shall continue in full force and effect.

# ARTICLE 7

## PROBLEM RESOLUTION PROCEDURES

**Section 7.01** The Companies and the Union agree that timely interaction on issues can eliminate the cause for most grievances. While management maintains the right and responsibility to make decisions which affect the business, the parties will endeavor to jointly evaluate and plan proposed actions that affect the employees, the Union and the Companies.

**Section 7.02**     **REQUEST FOR UNION REPRESENTATION**

The Companies shall release the appropriate Union representatives who are required by the Problem Resolution Procedures.

**A.**     At any meeting between a management representative and an employee in which a formal level of discipline is to be announced, or an investigatory interview where the employee may have a reasonable basis to expect that disciplinary action may result, a Union representative shall be present, if the employee requests.

   **1.**     The employee shall be informed of the subject of the meeting at any formal level of discipline or investigatory interview prior to the meeting.

   **2.**     The Union representative and the employee shall be allowed a reasonable period of time to consult prior to the meeting, if requested.

**Section 7.03**     **COMMUNICATION AND PROBLEM SOLVING**

We must initiate communication to prevent problems as most problems can be prevented through timely, open and honest communication.

**A.**     When operational changes are being considered in a work area that will significantly affect the working conditions of one or more employees, the manager will communicate these anticipated changes and the reasons for them to the appropriate Union representative and solicit any input to improve the effectiveness for all concerned. This communication will generally occur not less than ten (10) calendar days in advance of the effective date of such anticipated changes. In matters requiring immediate implementation, the minimum time frame shall not apply. In these cases, communication and solicitation for input from the Union will be conducted at the earliest practical opportunity. Subsequently, where agreement is reached, communication to the employees will be conducted jointly by the manager and the Union representative. In all cases, communication to the affected employees will not occur prior to a discussion with the appropriate Union representative.

**B.**     When an employee is trending toward disciplinary action for job performance, for example attendance, quality, quantity, etc., management will normally involve the Union and solicit its input and assistance. The manager and the Union representative will work jointly to identify and eliminate the cause of the employee's problem to prevent it from recurring.

**C.**     When a Union representative identifies an issue or dispute in the work area, he or she will interact with the appropriate manager in the work area.  An effort should be made by both parties to resolve the problem.

**Section 7.04          UNION PRESENTATION**

The grievance procedure is designed to provide a timely, energy effective way of insuring equality and fairness in resolving disputes which have not been resolved through informal efforts.  The Companies and the Union agree that it is their objective to resolve all grievances at the lowest level.

The presentation of a grievance must be made in writing as described in Section 7.05E1a and in accordance with the time limitations specified below to be eligible for handling under the provisions of Sections 7.05 and 7.09:

**A.**     Grievances concerning the impact of new, changed or deleted methods and/or procedures intended for department-wide application must be presented within sixty (60) calendar days of the date of the Companies' notification to the Union of their intent to take such action or, within thirty (30) calendar days from the occurrence that an employee is affected by the change, whichever date is later.

**B.**     All other grievances must be presented within thirty (30) calendar days from the first occurrence of the action or within thirty (30) calendar days from the date of discovery.

**Section 7.05          GRIEVANCE PROCEDURE**

In keeping with the Companies' and the Union's objective to resolve all grievances at the lowest level, an employee may present his or her grievance to a Union representative who will process it according to the following:

**A.**     A grievance involving the dismissal of any Regular or Term employee or a grievance involving disciplinary action other than dismissal of any employee will be presented as follows:

   **1.**     Step I - To the employee's immediate supervisor or, if appropriate, the manager who took the action.   Two (2) paid Union representatives designated by the Local may attend this meeting.  If the grievance is not resolved, it will be referred to:

   **2.**     Step II - District Level Manager (or equivalent title/skip level organizations).  Three (3) paid Union representatives designated by the Local may attend this meeting to attempt to resolve the grievance.  Only grievances involving the dismissal of a Regular or Term employee, which are not resolved, will be referred to Step III.

      **NOTE:**     The Step II meeting regarding any grievance may be omitted by mutual agreement.

**Section 7.05.A (continued)**

**3.** Step III - (Dismissal grievances only) Department AVP (or equivalent title/skip level organizations) and Local President or either of their designated representatives. Two (2) paid Union representatives designated by the Local may attend this meeting to attempt to resolve the grievance.

> **NOTE:** If the Step II meeting regarding the dismissal of a Regular or Term employee has been omitted, a maximum of three (3) paid Union representatives designated by the Local may attend the Step III meeting.

**B.** A grievance involving matters other than discipline will be presented as follows:

**1.** Step I - To the manager who approved the action. Two (2) paid Union representatives designated by the Local may attend this meeting. If the grievance is not resolved, it will be referred to:

**2.** Step II - The next level of management above the manager who heard the grievance at Step I (no lower than District Level or higher than Department Vice President or equivalent title/skip level organizations) and Local President or either of their designated representatives. Three (3) paid Union representatives designated by the Local may attend this meeting to attempt to resolve the grievance.

**C.** A non-disciplinary grievance that involves one (1) action that affects multiple employees in geographical jurisdictions represented by more than one Union Local will be considered as an Executive Level grievance and be presented as follows by the National Union to Labor Relations:

**1.** To Labor Relations. A Labor Relations manager, a representative from the National Union, a Company-designated representative from the Department and a Union-designated Bargaining Committee member may attend this meeting to attempt to resolve this grievance. The Union-designated Bargaining Committee member will be paid in accordance with Article 3, Section 3.02. On a case by case basis when necessary, a Local Union representative may attend the meeting.

**2.** Management will hold the Executive Level grievance meeting within thirty (30) calendar days of receipt of the Union's written presentation.

**3.** Following the Executive Level Meeting, Labor Relations will send an Executive Level Company position letter to the Union in accordance with Section 7.07.

**4.** If the grievance is not resolved, it may be escalated to arbitration by the Union in accordance with Section 7.10E.

**D.** One non-disciplinary grievance regarding a single action or decision by management involving multiple employees in a geographical jurisdiction represented by one Union Local may be filed in accordance with Section 7.05B1.

**ARTICLE 7**

81

**E.**   Step I Grievances will be processed according to the following method:

    **1.**   Prior to the <u>Step I</u> Meeting

        **a.**   The Union's written presentation of the grievance to management will include the nature of the grievance; the date of the occurrence; the contractual article/section alleged to have been violated, if applicable, or if not applicable, the source of the alleged violation (e.g., MOA name or number, discipline, documentation); the name of the grievant; and the remedy sought.  Presentation must be made in accordance with the time limits stated in Section 7.04.

        **b.**   Management will provide the Union with any information and/or reasons used as a basis for the grieved action no later than ten (10) calendar days following presentation of the grievance.  This requirement to share information and/or reasons for the grieved action applies whether or not a Step I meeting is held.

    **2.**   Holding the <u>Step I</u> Meeting

        **a.**   Management will hold the meeting within fifteen (15) calendar days following presentation of a grievance.

        **b.**   Both parties should make every effort to ensure that a Step I meeting is held.  However, in those circumstances where a Step I meeting is not held within fifteen (15) calendar days, as stated in Section 7.05E2a and no mutual agreement to extend the time limit is reached, or where there is mutual agreement to omit the Step I meeting, the grievance shall be considered denied by management and will then be escalated to Step II of the Grievance Procedure.

            NOTE:  If the Step I meeting is not held, management is required to provide the information specified in Section 7.05E1b.

    **3.**   Following the <u>Step I</u> Meeting

        **a.**   Management will inform the Union of the Company's position and rationale at the conclusion of the Step I meeting.

**F.**   Step II grievances will be processed according to the following method:

    **1.**   Prior to the <u>Step II</u> Meeting

        **a.**   The Union will notify the Company in writing of its intent to escalate the grievance to Step II within thirty (30) calendar days following the Step I meeting, or the date when the Step I meeting should have been held as stated in Section 7.05E2a.

**Section 7.05.F.1 (continued)**

      **b.**    The Union's failure to notify the Company, of its intent to escalate the grievance, within the time limit stated in Section 7.05F1a, will result in the grievance being considered withdrawn from the Grievance Procedure.

   **2.**    Holding the Step II Meeting

      **a.**    Management will hold the Step II grievance meeting within thirty (30) calendar days of receipt of the Union's written intent to escalate the grievance.

      **b.**    Failure to hold the Step II meeting within the time limit stated in Section 7.05F2a, or when no mutual agreement to extend the date has been reached, will result in the grievance being deemed as settled in favor of the Union.  However, the settlement cannot exceed what an arbitrator would have awarded under Sections 7.12 and 7.14.

   **3.**    Following the Step II Meeting

      **a.**    Management will send the Step II Company position to the Union and the appropriate Labor Relations Director, in accordance with Section 7.07, at the final disposition of the Step II meeting for grievances involving issues other than dismissal.

      **b.**    Management will inform the Union of the Company's position and rationale at the conclusion of all Step II meetings involving dismissal grievances.

**G.**    Step III grievances (DISMISSAL GRIEVANCES ONLY) will be processed according to the following method:

   **1.**    Prior to the Step III Meeting

      **a.**    The Union will notify the Company in writing of its intent to escalate the grievance to Step III within thirty (30) calendar days following the final disposition of the Step II meeting or the date it was mutually agreed to omit the Step II meeting.

      **b.**    The Union's failure to notify the Company of its intent to escalate the grievance, within the time limits stated in Section 7.05G1a, will result in the grievance being considered withdrawn from the Grievance Procedure.

   **2.**    Holding the Step III Meeting

      **a.**    Management will hold the Step III grievance meeting within thirty (30) calendar days of receipt of the Union's written intent to escalate the grievance.

      **b.**    Failure to hold the Step III meeting within the time limit stated in Section 7.05G2a or when no mutual agreement to extend the date has been reached, will result in the grievance being deemed as settled in favor of the Union.  However, the settlement cannot exceed what an arbitrator would have awarded under Sections 7.12 and 7.14.

    **3.**    Following the <u>Step III</u> Meeting

      Management will send the Step III Company position to the Union and the appropriate Labor Relations Director in accordance with Section 7.07.

**H.**    Pending final settlement of the grievance, the Companies shall not thereafter deal directly with the employee concerning said grievance without Union concurrence, but shall deal directly with the Union representative.

**Section 7.06**      **SHARING INFORMATION**

**A.**    During the Step I meeting, the Companies and the Union will identify appropriate areas of concern.  During Step I and Step II meetings, the Companies and the Union will share facts deemed relevant to the grievance by either party.

**B.**    Disputes over relevancy of information and photocopies will be resolved as follows:

    **1.**    The request should be presented in writing to the manager.  If the dispute is not resolved at this level within seven (7) calendar days, it shall be referred to:

    **2.**    The Local Union Officer and District Manager level.  If not resolved at this level within seven (7) calendar days, it shall be referred to:

    **3.**    The National Union Representative and Labor Relations Director level.  If not resolved at this level within seven (7) calendar days, the Union may elect to:

    **4.**    Arbitrate the issue under the provision of Section 7.10.

**C.**    The Companies reserve the right to charge the Union for the cost of the photocopies including the wages of the operator of the copying equipment in the event the volume of requests become substantial.

**Section 7.07          COMPANY POSITION**

The Step II or Step III or Executive Level Company position (as described in 7.05C3, 7.05F3 and 7.05G3) shall be sent by certified mail to the National and Local Union in writing within five (5) calendar days of the final Step II or Step III or Executive Level grievance meeting.  A copy will also be sent to the appropriate Labor Relations Director.

**Section 7.08          UNRESOLVED UNION PRESENTED GRIEVANCES**

Any grievance not resolved under Subsections 7.05A and 7.05B may be taken to arbitration under the provisions of Sections 7.10 or 7.15.

**Section 7.09          EMPLOYEE PRESENTATION**

**A.**     An employee may present his or her grievance to the employee's immediate supervisor within thirty (30) calendar days from the first occurrence, and to other successive levels of management up to and including the Department Manager (or authorized representative) as may be required to resolve the grievance without Union intervention.

**B.**     The resolution of an employee grievance may not be inconsistent with the terms of this Contract.  A Union representative will be given an opportunity to be present at the resolution of any employee grievance concerning the interpretation or application of the terms of this Contract.

**Section 7.10          ARBITRATION PROCEDURES**

Arbitration cases should be minimal due to effective use of the Problem Resolution Procedures.  Arbitration should result in timely awards.

**A.**     If the Union is not satisfied with the Companies' decision at the final meeting in the grievance procedure, the Union may request that the grievance be arbitrated.

**B.**     Any Regular or Term employee dismissed for just cause may have his or her case considered under the Arbitration Procedures.  However, the question as to whether a Regular or Term employee with less than twelve (12) months' net credited service was dismissed without just cause will not be eligible for arbitration.

**C.**     The National Union will notify the Labor Relations Director, in writing, of its desire to meet on the grievance within thirty-five (35) calendar days of receipt of the Step II or Step III Company position letter as described in Section 7.07 above.  The meeting between Labor Relations and the National Union will be held within fifteen (15) calendar days of receipt of the written notice.  The National Union may elect to waive this meeting and, within the same thirty-

five (35) calendar day time limit, notify the Companies of its intention to arbitrate the grievance as specified in 7.10D below.  If the Union fails to send either written notice within the time limit stated (35 calendar days), and no mutual agreement to extend the time limit has been reached, the grievance will be considered withdrawn from the grievance process.

**D.**     The Labor Relations Director, or designated representative, will send the final Company position letter to the National Union within five (5) calendar days of the National Union/Labor Relations meeting.  Within thirty (30) calendar days following the National Union's receipt of the Companies'  final position letter, as described in this Section 7.10D, the Union will notify the Companies in writing of its intention to arbitrate the grievance.  This notice will specify the issues involved in the grievance and remedy requested.  Specifically it will clarify the Union's original written presentation of the grievance to management.  This clarification will define the nature of the grievance; the date of the occurrence; the contractual article/section alleged to have been violated, if applicable, or if not applicable, the source of the alleged violation (e.g., MOA name or number, discipline, documentation); the name of the grievant; and the remedy sought for the purposes of arbitration, expedited arbitration and mediation.

If the Union does not notify the Companies in writing of its intention to arbitrate the grievance within the time limit stated (30 calendar days), and no mutual agreement to extend the time limit has been reached, the grievance will be considered withdrawn from the grievance process.

**E.**     Within thirty (30) calendar days following the National Union's receipt of the Companies' Executive Level position letter, as described in Section 7.07 above, the Union will notify the Companies in writing of its intention to arbitrate the Executive Level grievance.

If the Union fails to notify the Companies in writing of its intent to arbitrate the grievance within the time limit stated above and no mutual agreement to extend the time limit has been reached, the grievance will be considered withdrawn from the grievance process.

**F.**     The first day of the arbitration hearing will be held within six (6) months from the date of the Union's notification in writing of its intent to arbitrate the grievance.  If the arbitration request involves an employee's dismissal and the six (6) month time limit is exceeded, the period used for computation of any back pay liability for the Company shall not exceed a date six (6) months from the date of the Union's notification of intent to arbitrate the dismissal issue, except when the time limit has been extended by mutual agreement.

**Section 7.11         ARBITRATOR**

**A.**     A panel of arbitrators shall be established by the parties for hearing expedited and regular arbitration cases.  Upon receipt of the Union's intent to arbitrate, each case will be automatically assigned to an available arbitrator.  The first case so heard under this procedure shall be assigned to the arbitrator appearing first on the panel.  Subsequent arbitration requests shall be assigned to other arbitrators in the order of their sequential assignment to the panel.  If an arbitrator notifies the parties that he or she is unable to accept a case, it will be referred to the next arbitrator on the panel.

**B.**     Whenever any arbitrator's pending arbitration requests exceed three, additional requests which would otherwise be assigned to him or her in the order of rotation shall be referred to the next arbitrator on the panel.

**C.**     All eligible grievances shall be handled as follows:

**1.**     Request from the arbitrator, at the time of appointment, two or three proposed alternative hearing dates for hearing days within six (6) months from the date of the Union's notification of its intent to arbitrate.  If the arbitrator cannot provide a hearing date within the six (6) month time frame, the parties shall proceed through the remaining arbitrators, in order of appearance, until a hearing date can be scheduled in accordance with the time limits of this Section.

**2.**     The designated representatives of the Companies and of the Union shall promptly agree on a hearing date, secure a firm commitment on the hearing date from the arbitrator and schedule the hearing in accordance with regular procedures.

**3.**     If the parties can't agree on a proposed date, then the arbitrator shall schedule a hearing date within the six (6) month time frame.

**D.**     Grievances involving the suspension of an individual employee or a grievance involving the dismissal of a Regular or Term employee may be handled in accordance with the Expedited Arbitration provisions of Section 7.15 by mutual agreement of the Labor Relations Director and the designated representative of the National Union, except for those which also involve an issue of arbitrability, Contract interpretation, or work stoppage (strike) activity and those which are also the subject of an administrative charge or court actions.

**ARTICLE 7**

Section 7.12        **POWER OF THE ARBITRATOR**

**A.**     The Arbitrator has no authority to add to, subtract from, or otherwise modify the provisions of the Contract.

**B.**     If the Arbitrator finds that a dismissal was made without just cause, the Arbitrator will either:

    **1.**     Reinstate the employee with back pay computed in accordance with Section 7.14 as limited by Section 7.10F; or

    **2.**     Reduce the dismissal to a suspension and reinstate the employee without back pay for the period of suspension set by the Arbitrator as limited by Section 7.10F.

Section 7.13        **ARBITRATOR'S DECISION**

**A.**     Except as provided in Expedited Arbitration, Section 7.15, the Arbitrator will render a decision within thirty (30) calendar days from the date the matter is submitted.

**B.**     All decisions within the power of the Arbitrator will be final and binding on all parties.

**C.**     Decisions rendered under the provisions of Expedited Arbitration, Section 7.15, will not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the parties.

Section 7.14        **EFFECT OF RESOLUTION**

**A.**     Where employees are reinstated with back pay, the employees will receive their regular rate of pay for the time lost, but not for suspension time under Section 7.12B2 as limited by Section 7.10F.  They will also receive reimbursement for any actual expenses incurred and paid by the employees during the period of dismissal which would have normally been paid by the Companies' Medical, Dental, or Vision Plans.  Amounts paid to employees will be reduced by an amount equal to the total of the termination or layoff allowance received from the Companies at the time of dismissal, and any wages earned in other employment. Pacific Bell employees will be liable to the State of California, Employment Development Department for overpayment of unemployment benefits received since date of dismissal.  Nevada Bell employees will likewise be liable to the State of Nevada, Employment Security Department for such overpayments.

**B.**     In the event a grievance is arbitrated under the provisions of Expedited Arbitration, Section 7.15, any awarded back pay liability shall be computed in accordance with the provisions as expressed in Sections 7.12B1 and 7.12B2, as limited by Section 7.10F.

**Section 7.15      EXPEDITED ARBITRATION PROCEDURE**

The procedure for Expedited Arbitration will be as follows:

**A.**    A written stipulation of all facts not in dispute may be submitted to the Arbitrator prior to the hearing.

**B.**    The hearing will be informal without rules of evidence and without a transcript. However, the Arbitrator will satisfy himself or herself that the evidence submitted is of a type on which he or she can rely, that the hearing is fair in all respects and that all facts necessary to a fair settlement and reasonably obtainable are brought before the Arbitrator.

**C.**    Each party may submit a brief written summary of the issues raised at the hearing and arguments supporting its position within five (5) working days after the hearing.

**D.**    The Arbitrator will render his or her decision within five (5) working days after receiving the briefs.  He or she will provide the parties a brief written statement of the reasons supporting the decision.

**Section 7.16      ARBITRATION EXPENSES**

The compensation and expenses of the Arbitrator and the general expenses of the arbitration will be borne by the Companies and the Union in equal parts.  Each party will bear the expense of its representatives and witnesses.

**Section 7.17      TIME LIMITS**

The time periods specified in the grievance and arbitration procedures will be calendar days except for Section 7.15 and may be extended by mutual agreement.

**Section 7.18      MEDIATION**

**A.**    A grievance that has been appealed to arbitration in accordance with Section 7.10 may be presented at a mediation conference before it is scheduled for arbitration, except when either party requests that mediation be bypassed.

**B.**    Within six (6) months of the Union's request for arbitration, the parties will schedule a mediation conference to be held at the earliest available date of a mediator mutually agreeable to both parties.  The mediation conference will normally be held in either a Company or Union facility.  Should the availability of a mediator unnecessarily delay the processing of the grievance in the opinion of either party, either party may request that the mediation step be bypassed and the grievance be scheduled for arbitration.

ARTICLE 7

<u>**Section 7.18 (continued)**</u>

**C.** The spokesperson for the Company will normally be a Staff Manager - Labor Relations. An Area Representative - Communications Workers of America will normally represent the Union. An attorney will not be used by either party at the mediation conference. The number of employees who shall suffer no loss in pay under Article 3, Section 3.02 of the Contract shall be no more than two (2). Should additional employees be necessary for the complete discovery of facts at the conference, the parties will agree in advance on the number of additional employees who will attend the conference and suffer no loss in pay under Section 3.02.

**D.** The representatives of the parties are encouraged, but not required to present the mediator with a brief written statement of the facts, the issue and the arguments in support of their respective positions. If such statement is not presented in written form, it shall be presented orally at the beginning of the mediation conference.

**E.** The mediation conference will normally be attended by the grievant, the Local President, the grievant's supervisor and District Level Manager. Attendance at the mediation conference shall be limited to those people actually involved in the mediation conference.

**F.** All written material that is presented to the mediator or to the other party shall be returned to the party presenting the material at the termination of the mediation conference. The mediator may, however, retain one copy of the written grievance, to be used solely for purposes of statistical analysis.

**G.** Proceedings before the mediator shall be informal in nature. The presentation of evidence is not limited to that which has been presented in the grievance proceedings. However, the issue mediated will be the same as the issue the parties have tried to resolve through the grievance process. The rules of evidence will not apply, and no record of the mediation conference shall be made.

**H.** The mediator will have the authority to meet separately with Company or Union representatives, but will not have the authority to compel the resolution of a grievance.

**I.** The Company and Union spokespersons at the mediation conference may accept the resolution proposed by the mediator and such settlement or any other settlement resulting from the conference shall not be precedent-setting for other cases or grievances and may not be cited in any other proceeding between the parties. If no settlement is reached during the mediation conference, the mediator shall provide the parties with an immediate oral advisory opinion, unless both parties agree that no opinion shall be provided. The mediator shall state the grounds of his or her advisory opinion.

**Section 7.18 (continued)**

**J.**   If no settlement is reached at the mediation conference, the grievance will be heard in arbitration in accordance with provisions expressed in Section 7.10. Such hearing will be held within six (6) months of the date of the mediation hearing.  In the event that a grievance which has been mediated subsequently is arbitrated, no person serving as a mediator between these parties may serve as arbitrator.  Nothing said or done by the mediator may be referred to at arbitration. Any settlement proposal made by either party at the mediation conference shall not be referred to at the arbitration hearing.

**K.**   The mediator shall conduct no more than three (3) mediation conferences per day. The fee and reasonable expenses of the mediator will be shared equally by the parties.

**L.**   In the event that the mediation of a grievance is scheduled, and then postponed or canceled, the parties shall remain liable for the fee specified in Section 7.18K, unless another grievance is substituted for that grievance postponed or canceled.

**Section 7.19        DISMISSALS**

**A.**   The Companies agree that no employee will be dismissed without a full and complete investigation by department supervision. The Companies recognize the right of the Union to assist an employee who has been suspended pending investigation, or who has been given notice of dismissal, or who has been dismissed, in presenting and/or appealing the employee's case to the Companies.

**B.**   When it is necessary to dismiss an employee, the employee must be paid in full immediately for all time due.  Every employee who is dismissed will be paid at the place of dismissal.

**ARTICLE 7**

Exhibit B

# Robert Z. Bruckman, M.D.

2300 SUTTER STREET, SUITE 304 • SAN FRANCISCO, CA 94115
VOICE: (415) 563-2233    FAX: (415) 563-5311

**Fellow American Academy of Orthopedic Surgeons**

November 21, 2013

## AGREED MEDICAL RE-EVALUATION

Joanna Losee, J.D.
Law Offices of Niloufar Mazhari
5258 Hiddencrest Court
Concord, CA 94521

Bob Canning, Esq.
Sedgwick CMS
P.O. Box 51460
Ontario, CA 91761

|        |                               |
|--------|-------------------------------|
| Re:    | JAMES MULVANEY                |
| Emp:   | Pacific Bell Telephone Company |
| DOI:   | CT-04/26/2012; CT-09/15/2012  |
| Claim#: | B325009008; B325009009       |
| WCAB#: | ADJ8885542; ADJ8830069        |

Gentlepersons:

I had the opportunity to again examine Mr. James Mulvaney.

> *This report is submitted pursuant to California Code of regulations Title 8, section 9795 as an ML 101-94 Follow-Up Agreed Medical-Legal Evaluation and includes 1 hour of face-to-face time with the patient, 1 hour for review of records, and 2 hours for preparation of report and transcription services.*

Since last seen, Mr. Mulvaney has worked hard on stretching as I had taught him. He has been wearing arch supports and has been negotiating for improved supports which should help further. His foot has improved markedly and he is now able to walk without difficulty once he is "warmed up".

Mr. Mulvaney's shoulder and knee are very much as described in my September 20, 2013 letter. I think it reasonable that this case can proceed to permanent and stationary status at this point.

AGREED MEDICAL RE-EVALUATION                    November 21, 2013
RE:  JAMES MULVANEY                                        Page 2

RETURN TO WORK:

Mr. Mulvaney has returned to work. He is transferring to a new work group within Pacific Bell and expects to be able to use a bucket rather than to actively climb poles. This will enable him to continue to work indefinitely.

Mr. Mulvaney has occasional aching in his shoulder. The range of motion is exactly as noted on page 4 of my September 20, 2013 report ,which is basically within normal limits. The impingement signs remain negative.

Nonetheless, the fact that he has experienced an episode of impingement, treated surgically will make it difficult or impossible for him to work at or above shoulder level indefinitely.

IMPAIRMENT:

The AMA Guides are particularly remiss in evaluating shoulder difficulties in the presence of normal motion. I am thus obliged to recommend that Almaraz/Guzman be considered in evaluating his loss, which is in fact a real loss. In my opinion he has lost 10% of upper extremity function as a result of his shoulder injury. Table 16-2 on page 439 indicates that a 10% upper extremity loss is equivalent to a 6% whole person impairment. That is my recommendation regarding the patient's left shoulder.

Mr. Mulvaney's left knee injury required a partial meniscectomy. In this instance the AMA Guides are satisfactory for providing impairment (Table 17-33 on page 546) recommends 1% WPI for medial or lateral meniscectomy. 1% should be added to the 6% noted previously.

The patient's plantar fasciitis is currently quiescent and requires no impairment rating. The metatarsal neck fracture of the left foot has healed and is not impairing.

APPORTIONMENT:

Apportionment is 100% industrial with old injuries being secondary to the incident in which he was forced to slide down a pole out-of-control in April of 2011.

CAUSATION:

Causation of this injury is a fall while descending from a telephone pole.

I appreciate the opportunity to review this situation.

AGREED MEDICAL RE-EVALUATION                                   November 21, 2013
RE:  JAMES MULVANEY                                                        Page 3

The face-to-face time spent with the patient was in compliance with the Guidelines per 8 CCR Section 49.

I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except as noted herein, that I believe it to be true.

I further declare under penalty of perjury that I personally performed the evaluation of this patient on November 21, 2013 at 2300 Sutter Street, Suite 304, San Francisco, California and that except as otherwise stated herein, the evaluation was preformed and the time spent performing the evaluation was in compliance with the Guidelines, if any, established by the Industrial Medical Council or the Administrative Director pursuant to paragraph (5) of subdivision (j) of Section 139.2 or Section 530.7 of the California Labor Code.

I further declare under penalty of perjury that I have not violated the provisions of California Labor Code Section 139.3 with regard to the evaluation of this patient or the preparation of this report.

Signed  this  _____26_____  day  of  _November_ , 2013  at  San Francisco, California.

_____
Robert Z. Bruckman, M.D.
Qualified Medical Evaluator

RZB/pb

Enclosures:  Proof of service

cc:    Agnes Samuel
       Sedgwick CMS
       P.O. Box 14627
       Lexington, KY 40512

       James Mulvaney
       1921 S. Willowcreek Drive
       Tracy, CA 95376

*State of California*
**DIVISION OF WORKERS' COMPENSATION – MEDICAL UNIT**

### AME or QME Declaration of Service of Medical - Legal Report (Lab. Code § 4062.3(i))

Case Name: **JAMES MULVANEY**                    v    **Sedgwick CMS**
    *(employee name)*                                   *(claims administrator name, or if none employer)*

Claim No.: **B325009008; B325009009**

EAMS or WCAB Case No. *(if any)*: ADJ8885542; ADJ8830069

I, _____ **Vanessa Cordova** _____, declare:
                                    *(Print Name)*

1. I am over the age of 18 and not a party to this action.

2. My business address is: **2300 Sutter Street, Suite 304, San Francisco, CA 94115**

3. On the date shown below, I served the attached original, or a true and correct copy of the original, comprehensive medical-legal report on each person or firm named below, by placing it in a sealed envelope, addressed to the person or firm named below, and by:

    A        depositing the sealed envelope with the U. S. Postal Service with the postage fully prepaid.

    B        placing the sealed envelope for collection and mailing following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the U. S. Postal Service in a sealed envelope with postage fully prepaid.

    C        placing the sealed envelope for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

    D        placing the sealed envelope for pick up by a professional messenger service for service. *(Messenger must return to you a completed declaration of personal service.)*

    E        personally delivering the sealed envelope to the person or firm named below at the address shown below.

| Means of service: *(For each addressee, enter A – E as appropriate)* | Date Served: | Addressee and Address Shown on Envelope: |
|---|---|---|
| B | 11/26/13 | Joanna Losee, J.D. Law Offices of Niloufar Mazhari 5258 Hiddencrest Court Concord, CA 94521 |
| B | 11/26/13 | Bob Canning, Esq. Sedgwick CMS P.O. Box 51460 Ontario, CA 91761 |
| B | 11/26/13 | Agnes Samuel Sedgwick CMS   P.O. Box 14627, Lexington, KY 40512 |
| B | 11/26/13 | James Mulvaney 1921 S. Willowcreek Drive, Tracy, CA 95376 |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.      Date: **11/26/13**

_____                              *Vanessa Cordova*
    *(signature of declarant)*                                    *(print name)*

QME Form 122
Rev. February 2009

Exhibit C

B325009008   S/C 

**STATE OF CALIFORNIA**
**WORKERS' COMPENSATION APPEALS BOARD**

1515 CLAY ST., 6ᵀᴴ FL
OAKLAND, CA 94612

JAMES Mulvaney

**APPLICANT**

v.

Pacific Bell   **DEFENDANTS**

CASE NUMBER(s) 88 85542 / 9830069

**MINUTES OF HEARING/ORDER/ORDER AND
DECISION ON REQUEST FOR CONTINUANCE/
ORDER TAKING OFF CALENDAR/
NOTICE OF HEARING**

☐ BEFORE  ☑ AT
☐ TRIAL   ☑ MSC   ☐ WALK-THROUGH
☐ CONF    ☐ EXP HEARING   ☐ LIEN CONF/TRIAL

DATE OF: HEARING 3-24-16   REQUEST 3-24-16

**APPEARANCES**   APPLICANT ☑ PRESENT ☐ NOT PRESENT
APPLICANT REPRESENTED BY   GUANA LOSEE   ☐ ATTORNEY ☑ HEARING REP.
DEFENDANT REPRESENTED BY   Bob CANNINg   ☐ ATTORNEY ☑ HEARING REP.
OTHERS APPEARING   Teresa Booker -EDD   ☐ ATTORNEY ☑ HEARING REP.
INTERPRETER _____   CERTIFICATION NO. _____

**PARTY MAKING REQUEST**   ☑ JOINT   ☐ APPLICANT   ☐ DEFENDANT   ☐ OTHER _____
**REQUEST FOR:** ☐ CONTINUANCE   ☐ OTOC   **REQUEST BY:** ☐ LETTER   ☐ TELEPHONE
**POSITION OF OPPOSING PARTY** ☐ AGREE   ☐ OPPOSE   ☐ UNREACHABLE   ☐ UNKNOWN

**REASON FOR REQUEST**

☑ FURTHER DISCOVERY: ☐ APP MED ☐ DEF MED ☐ AME ☐ DEPO
☑ CALENDAR CONFLICT: ☐ APPLICANT ☐ DEFENSE ☐ L.C.
☑ SETTLEMENT PENDING
☐ IMPROPER/INSUFFICIENT NOTICE BY PARTY
☐ IMPROPER DECLARATION OF READINESS/VALID OBJECTION
☐ NON APPEARANCE ☐ APP ☐ DEF ☐ LIEN CLAIMANT ☐ WITNESS
☐ APPLICANT ☐ DEF COUNSEL ☐ VACATION ☐ ILLNESS
☐ UNAVAILABILITY OF WITNESSES ☐ APP ☐ DEFENSE
☐ DISPUTE RESOLVED BY AGREEMENT ☐ NO ISSUES PENDING
☐ JOINDER ☐ CONSOLIDATION ☐ VENUE ☐ NEW APPLICATION
☐ AUTO REASSIGN ☐ DISQUALIFY ☐ APP ☐ DEFENDANT
☐ APPLICANT NOW REPRESENTED ☐ REQUESTS
REPRESENTATION
☐ CHANGE OF CIRCUMSTANCES

**BOARD REASON**

☐ INSUFFICIENT TIME   ☐ TO START   ☐ TO FINISH
☐ REASSIGNMENT:   ☐ REFUSED ☐ NOT AVAILABLE
☐ REPORTER ☐ INTERPRETER ☐ NOT AVAILABLE
☐ WCJ NOT AVAILABLE   ☐ RECUSAL
☐ UEF ISSUES ☐ SERVICE DEFECTIVE ☐ BANKRUPTCY
PENDING
☐ DEFECTIVE WCAB NOTICE
☐ ARBITRATION
OTHER/COMMENTS _____
_____
_____
_____
_____
_____

**GOOD CAUSE APPEARING, IT IS ORDERED THAT THE REQUEST FOR** ☐ CONT ☐ OTOC IS ☑ GRANTED ☐ DENIED
_____ DAYS FOR ☐ C&R ☐ STIPS ☐ OBJECTION   OTHERWISE: ☐ OTOC ☐ RESET _____
☑ OTOC   ☐ C&R/STIPS SUBMITTED FOR APPROVAL   ☑ C&R/STIPS APPROVED
☐ LIEN STIPS AND ORDER APPROVED   ☐ N.O.I. TO ALLOW/DISALLOW ISSUED
☐ SET FOR ☐ MSC ☐ CONF ☐ TRIAL ☐ EXP HRG ☐ CONTD TSTNY TIME ☐ ¼ HR ☐ ½ HR ☐ 1 HR ☐ 2 HRS ☐ 4 HRS ☐ DAY
SET ON _____ AT _____ LOCATION _____   BEFORE JUDGE _____
☐ SUPPLEMENTAL PAGES ATTACHED _____ PAGES
DATE 3/25/16
NOTICE TO   B Canning

Pursuant to Rule 10500 you are designated to serve this/these
document(s) on all parties as shown on the Official Address Record.
Served on designated server with a copy of the Official Address Record.
Date _____ By _____
☐ Served on parties and lien claimants present

**WORKERS' COMPENSATION ADMINISTRATIVE LAW JUDGE**
**JAMES GRIFFIN**

Cannot read

Applicant/Employee: _James Mulvaney_ WCAB NO(s). ADJ _8895542_/_8830064_

_____ (Legacy number(s): _____

_____ )

## AWARD

Based upon the Stipulations with Request for Award submitted herein:

AWARD IS MADE in favor of _JAMES Mulvaney_ _____ against

_Pacific Bell_ _____ of:

(A) Additional temporary disability indemnity in accordance with section 2(a) above;

(B) Permanent disability indemnity in accordance with section 3 above;

Less the sum of $ _5430.79_ , payable to Applicant's attorney as the reasonable value of services

rendered. ☑ Fees are to be commuted pursuant to section 6;

(C) Liens in accordance with section 7;

(D) Further medical treatment in accordance with section 4;

(E) Reimbursement for medical-legal expenses in accordance with section 5;

(F) Stipulations in sections 8 and 9 are approved;

(G) The matter is ordered taken off calendar.

(H) _____

_____

_3/25/16_
(Dated)

**JAMES GRIFFIN**
**WORKERS' COMPENSATION JUDGE**
**WORKERS' COMPENSATION APPEALS BOARD**

☐NOTICE TO: _B Combs_

On _____, this document ☐was
personally served on all persons appearing at the
hearing on that date as set forth in the minutes of
that hearing ☐was personally served on:

_____
_____
_____

☐was served by US mail☐ email ☐ fax ☐ on all
persons listed on the Official Address Record ☐
was served by US mail☐ email ☐ fax☐ on the
following party or parties:_____

_____
_____

By:_____

Pursuant to Rule 10500, you are designated to
serve this document on all parties shown on the
Official Address Record, together with a proof of
service. You shall maintain this proof of service,
which shall not be filed with the WCAB unless a
dispute arises regarding service. A copy of the
current Official Address Record accompanies this
notice.

(Rev 9/28/2011)



## STATE OF CALIFORNIA
## DIVISION OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD
## STIPULATIONS WITH REQUEST FOR AWARD

ADJ 8885542

Date of Injury  04/26/2012

**Case No.**

**SSN (Numbers Only)**

MM/DD/YYYY

**Venue Choice is based upon: (Completion of this section is required)**

☐ County of residence of employee (Labor Code section 5501.5(a)(1) or (d).)

☐ County where injury occurred (Labor Code section 5501.5(a)(2) or (d).)

☑ County of principal place of business of employee's attorney (Labor Code section 5501.5(a)(3) or (d).)

**OAK**

Select 3 Letter Office Code For Place/Venue of Hearing (From the Document Cover Sheet)

**Applicant (Completion of this section is required)**

JAMES ~~MULVANEY~~

**First Name**

MI

MULVANEY

**Last Name**

1921 SOUTH WILLOWCREEK DRIVE

Address/PO Box (Please leave blank spaces between numbers, names or words)

TRACY

**City**

CA

**State**

95376

**Zip Code**

**Employer #1 Information (Completion of this section is required)**

☑ Insured          ☐ Self-Insured          ☐ Legally Uninsured          ☐ Uninsured

PACIFIC BELL

Employer Name (Please leave blank spaces between numbers, names or words)

2600 CAMINO RAMON

Employer Street Address/PO Box (Please leave blank spaces between numbers, names or words)

SAN RAMON

**City**

CA

**State**

94583

**Zip Code**

DWC-CA form 10214 (a) Page 1 (Rev 11/2008)

Insurance Carrier Information (if known and if applicable - include even if carrier is adjusted by claims administrator)

**OLD REPUBLIC INDMENTY**
Insurance Carrier Name (Please leave blank spaces between numbers, names or words)

**PO BOX 51460**
Insurance Carrier Street Address/PO Box (Please leave blank spaces between numbers, names or words)

**ONTARIO**                                                **CA**      **91761**
City                                                        State      Zip Code

Claims Administrator Information (if known and if applicable)

**SEDGWICK CMS**
Name (Please leave blank spaces between numbers, names or words)

**PO BOX 51460**
Street Address/PO Box (Please leave blank spaces between numbers, names or words)

**ONTARIO**                                                **CA**      **91761**
City                                                        State      Zip Code

Employer #2 Information (Completion of this section is required)

☐ Insured        ☐ Self-Insured        ☐ Legally Uninsured        ☐ Uninsured

Employer Name (Please leave blank spaces between numbers, names or words)

Employer Street Address/PO Box (Please leave blank spaces between numbers, names or words)

City                                                        State      Zip Code

Insurance Carrier Information
(if known and if applicable - include even if carrier is adjusted by claims administrator)

Insurance Carrier Name (Please leave blank spaces between numbers, names or words)

Insurance Carrier Street Address/PO Box (Please leave blank spaces between numbers, names or words)

City                                                        State      Zip Code

DWC-CA form 10214 (a) Page 2 (Rev 11/2008)

**Claims Administrator Information (if known and if applicable)**

Name (Please leave blank spaces between numbers, names or words)

Street Address/PO Box (Please leave blank spaces between numbers, names or words)

City                                                                 State      Zip Code

**Employer #3 Information (Completion of this section is required)**

☐ Insured            ☐ Self-Insured         ☐ Legally Uninsured      ☐ Uninsured

Employer Name (Please leave blank spaces between numbers, names or words)

Employer Street Address/PO Box (Please leave blank spaces between numbers, names or words)

City                                                                 State      Zip Code

**Insurance Carrier Information**
**(if known and if applicable - include even if carrier is adjusted by claims administrator)**

Insurance Carrier Name (Please leave blank spaces between numbers, names or words)

Insurance Carrier Street Address/PO Box (Please leave blank spaces between numbers, names or words)

City                                                                 State      Zip Code

**Claims Administrator Information (if known and if applicable)**

Name (Please leave blank spaces between numbers, names or words)

Street Address/PO Box (Please leave blank spaces between numbers, names or words)

City                                                                 State      Zip Code

DWC-CA form 10214 (a) Page 3 (Rev 11/2008)

**Employer #4 Information (Completion of this section is required)**

☐ Insured   ☐ Self-Insured   ☐ Legally Uninsured   ☐ Uninsured

Employer Name (Please leave blank spaces between numbers, names or words)

Employer Street Address/PO Box (Please leave blank spaces between numbers, names or words)

| City | State | Zip Code |

**Insurance Carrier Information**
**(If known and if applicable - include even if carrier is adjusted by claims administrator)**

Insurance Carrier Name (Please leave blank spaces between numbers, names or words)

Insurance Carrier Street Address/PO Box (Please leave blank spaces between numbers, names or words)

| City | State | Zip Code |

**Claims Administrator Information (If known and if applicable)**

Name (Please leave blank spaces between numbers, names or words)

Street Address/PO Box (Please leave blank spaces between numbers, names or words)

| City | State | Zip Code |

The parties hereto stipulate to the issuance of an Award and/or Order, based upon the following facts, and waive the requirements of Labor Code section 5313:

1. JAMES
   Employees First Name

   MULVANEY ,
   Employees Last Name

   birth date   REDACTED/1955 ,
   MM/DD/YYYY

   while employed at   WORK LOCATION ,   CA
   State

   as a(n)   SPLICING TECHNICIAN ,   482   in
   Occupation   Group

DWC-CA form 10214 (a) Page 4 (Rev 11/2008)

☐ **More than 4 Companion Cases**

☐ Specific Injury

<u>ADJ 8885542</u>
Case Number 1

☑ Cumulative Injury

<u>04/27/2011</u>
(Start Date: MM/DD/YYYY)

<u>04/27/2012</u>
(End Date: MM/DD/YYYY)
(If Specific Injury, use the start date as the specific date of injury)

Body Part 1: <u>450 SHOULDER</u>     Body Part 2: <u>513 KNEE</u>     Body Part 3: <u>842 PSYCH</u>

Body Part 4: _____     Other Body Parts: _____

☐ Specific Injury

<u>ADJ8830069</u>
Case Number 2

☑ Cumulative Injury

<u>09/16/2011</u>
(Start Date: MM/DD/YYYY)

<u>09/15/2012</u>
(End Date: MM/DD/YYYY)
(If Specific Injury, use the start date as the specific date of injury)

Body Part 1: <u>530 FOOT</u>     Body Part 2: _____     Body Part 3: _____

Body Part 4: _____     Other Body Parts: _____

☐ Specific Injury

Case Number 3

☐ Cumulative Injury

(Start Date: MM/DD/YYYY)     (End Date: MM/DD/YYYY)
(If Specific Injury, use the start date as the specific date of injury)

Body Part 1: _____     Body Part 2: _____     Body Part 3: _____

Body Part 4: _____     Other Body Parts: _____

☐ Specific Injury

Case Number 4

☐ Cumulative Injury

(Start Date: MM/DD/YYYY)     (End Date: MM/DD/YYYY)
(If Specific Injury, use the start date as the specific date of injury)

Body Part 1: _____     Body Part 2: _____     Body Part 3: _____

Body Part 4: _____     Other Body Parts: _____

by the employer(s) and their insurer(s) listed above and who sustained injury(ies) arising out of and in the course of employment to

ADJ 8885542-LEFT SHOULDER, LEFT KNEE AND PSYCHE
ADJ 8830069-RIGHT FOOT

(Please list all body parts injured)

DWC-CA form 10214 (a) Page 6 (Rev 11/2008)

B325009008000101

5120160405158471

2. The injury (ies) caused temporary disability for the period _IN DISPUTE_ through _____
   MM/DD/YYYY

_____ for which indemnity has been paid at $ _____ per week.
   MM/DD/YYYY                                                                Indemnity Paid

2(a).The injury(ies) caused additional temporary disability for the period _____
                                                                            MM/DD/YYYY

through _____ at the rate of $ _____ in the amount of $ _____
         MM/DD/YYYY                        Rate                              Indemnity Paid

3. The injury(ies) caused permanent disability of 31 _____ % for which indemnity is payable at $ 230.00
                                                                                                      36,205 29 _ 11 rate    Indemnity Rate
                                                                                                                            Wk= 32.38
per week beginning _____ 09/30/2012 _____ in the sum of $ 31,470.00 , less credit for such payments
                              MM/DD/YYYY

previously made. ☐ And a life pension of $ _____ per week thereafter.
                                           Life Pension

   Labor Code §4658(d) adjustment:

   ☑ Increase rate to $ 264.50 _____ as of _____ 12/10/2015 _____
                                                            MM/DD/YYYY

   ☐ Decrease rate to $ _____ as of _____
                                                    MM/DD/YYYY

   ☐ Not Applicable

An informal rating ☐ has / ☑ has not (Select one) been previously issued in case no(s) _____

4. There ☑ is / ☐ is Not a need for medical treatment to cure or relieve from the effects of said injury (ies).

5. Medical-legal expenses and/or liens are payable by defendant as follows:

ALL SUBMITTED TO DATE

6. Applicant's attorney requests a fee of $ _5430.79_ _____

☒ Fees to be commuted as follows:

FROM FAR END OF AWARD IF INSUFFICIENT FUNDS HAVE ACCRUED

7. Liens Against compensation are payable as follows:

NONE

DWC-CA form 10214 (a) Page 6 (Rev 11/2008)

8.Any accrued claims for Labor Code section 5814 penalties are included in this settlement unless expressly excluded.

9.Other stipulations:

INTEREST WAIVED IF PAID WITHIN ⑮DAYS OF APPROVAL. THESE STIPULATIONS ADDRESS ALL PERMANENT DISABILITY TO THE ABOVE BODY PARTS THAT MAY HAVE OCCURRED IN THE COURSE OF HIS EMPLOYMENT WITH AT&T OR ANY OF ITS SUBSIDIARIES. THE PARTIES AGREE THERE IS NO NEED FOR FUTURE MEDICAL CARE TO THE RIGHT FOOT ONLY. THE PARTIES AGREE THAT DEFENDANT IS ENTITLED TO CREDIT AGAINST PERMANENT DISABILITY IN THE AMOUNT OF $23,168.56 FOR PAYMENTS MADE PURSUANT TO ITS NON-CONTRIBUTORY SHORT TERM DISABILITY PLAN (APPLEBY V. PACIFIC BELL). THESE STIPULATIONS ADDRESS ANY CLAIM FOR TEMPORARY DISABILITY, *EDD agrees to accept $28,901.15 as full satisfaction of its lien. J. Parker/EDD 3.25.16*

*The claim for Dr. Phillip Coleman's bill for $73.21 is deferred, Parties will pay, adjust or litigate.*

*⁎ Excess Plan Credit of $23,168.56 subject to proof*

Dated __03/24/2016__
MM/DD/YYYY

_____
Applicant

**Applicant's Attorney or Authorized Representative:**

☑ Law Firm/Attorney     ☐ Non Attorney Representative

__NILOUFAR__
First Name

__MAZHARI__
Last Name

__4257526__
Firm Number

__NILOUFAR MAZHARI CONCORD__
Law Firm name

__5258 HIDDENCREST CT__
Address/PO Box (Please leave blank spaces between numbers, names or words)

__CONCORD__          __CA__   __94521__
City                 State   Zip Code

Dated __03/24/2016__          _____
MM/DD/YYYY                     Applicant Attorney Signature

DWC-CA form 10214 (a) Page 7 (Rev 11/2008)

**Defendant's Attorney or Authorized Representative:**

☐ Law Firm/Attorney          ☑ Non Attorney Representative

BOB
First Name

CANNING
Last Name

Firm Number

Law Firm Name

PO BOX 51460
Address/PO Box (Please leave blank spaces between numbers, names or words)

ONTARIO                                          CA          91761
City                                             State       Zip Code

Dated   03/24/2016
        MM/DD/YYYY                               Defense Attorney Signature

**Defendant's Attorney or Authorized Representative:**

☐ Law Firm/Attorney          ☐ Non Attorney Representative

First Name

Last Name

Firm Number

Law Firm Name

Address/PO Box (Please leave blank spaces between numbers, names or words)

City                                             State       Zip Code

Dated
        MM/DD/YYYY                               Defense Attorney Signature

DWC-CA form 10214 (a) Page 8 (Rev 11/2008)

**Defendant's Attorney or Authorized Representative:**

☐ Law Firm/Attorney     ☐ Non Attorney Representative

First Name

Last Name

Firm Number

Law Firm Name

Address/PO Box (Please leave blank spaces between numbers, names or words)

City                                               State     Zip Code

Dated _____                    _____
         MM/DD/YYYY                              Defense Attorney Signature

Interpreter Licence Number:

_____                  _____
      Interpreter Name                         Interpreter License Number

DWC-CA form 10214 (a) Page 9 (Rev 11/2008)

**NILOUFAR MAZHARI**
ATTORNEY AT LAW

5353 HIDDENCREST COURT
CONCORD, CALIFORNIA 94521

JOANNA T. LOSEE, J.D.
WORKERS' COMPENSATION HEARING REP.

TELEPHONE  (925) 827-1127
STATE BAR NO. 159355

FAX .(925) 671-4790

BOARD RULE 10773

TO WHOM IT MAY CONCERN:

I am an attorney licensed to practice law in the State of California, and the attorney of record for the applicant in this case. I am directly responsible for supervising my hearing representative in this case, Joanna T. Losee, J.D. Applicant retained our office because in addition to my services, my hearing representative, Joanna T. Losee, J.D., has thirty-three years of experience in the fields of labor and employment law, with twenty of those years being exclusively in the area of workers' compensation. Ms. Losee was also previously a workers' compensation claims manager for a large permissably self-insured employer, Pacific Bell.

Ms. Losee graduated from law school in 1995 and received her Doctor of Jurisprudence degree at that time. Additionally, Ms. Losee is authorized by me to sign settlement documents in this case on my behalf.

DATED: 3/10/11

_____
NILOUFAR MAZHARI

3/1/13
_____
(Date)

_____
(Client Signature)

Applicant/Employee: _James Mulvaney_ WCAB NO(s). ADJ _8.895542_ / _8830069_
(Legacy number(s): _____

## AWARD

Based upon the Stipulations with Request for Award submitted herein:

AWARD IS MADE in favor of _JAMES Mulvaney_ against
_Pacific Bell_ of:

    (A) Additional temporary disability indemnity in accordance with section 2(a) above;

    (B) Permanent disability indemnity in accordance with section 3 above;

    Less the sum of $ _5430.79_ , payable to Applicant's attorney as the reasonable value of services

rendered. ☑ Fees are to be commuted pursuant to section 6;

    (C) Liens in accordance with section 7;

    (D) Further medical treatment in accordance with section 4;

    (E) Reimbursement for medical-legal expenses in accordance with section 5;

    (F) Stipulations in sections 8 and 9 are approved;

    (G) The matter is ordered taken off calendar.

    (H) _____

_3/25/16_
(Dated)

**JAMES GRIFFIN**
WORKERS' COMPENSATION JUDGE
WORKERS' COMPENSATION APPEALS BOARD

On _____, this document ☐was
personally served on all persons appearing at the
hearing on that date as set forth in the minutes of
that hearing ☐was personally served on:

☐was served by US mail☐ email ☐ fax ☐ on all
persons listed on the Official Address Record ☐
was served by US mail☐ email ☐ fax ☐ on the
following party or parties:_____

By:_____

☑NOTICE TO: _BC Banks_
Pursuant to Rule 10500, you are designated to
serve this document on all parties shown on the
Official Address Record, together with a proof of
service. You shall maintain this proof of service,
which shall not be filed with the WCAB unless a
dispute arises regarding service. A copy of the
current Official Address Record accompanies this
notice.

Exhibit D

**PARKER, SUSAN R**

| | |
|---|---|
| **From:** | GONZAGA, SCOTT L |
| **Sent:** | Thursday, April 07, 2016 11:35 AM |
| **To:** | PARKER, SUSAN R |
| **Subject:** | FW: Claim - B325009008-0001-01 - JAMES MULVANEY  - Date of Loss: 04/26/2012 - Permanent work restriction |

Scott Gonzaga
Area Manager
North Bay Construction
Office - (925) 432-2060
PCS – (925) 642-5882

**From:** Bennett, Vernon [mailto:Vernon.Bennett@sedgwickcms.com]
**Sent:** Thursday, April 07, 2016 11:32 AM
**To:** GONZAGA, SCOTT L <sg2858@att.com>
**Subject:** Claim - B325009008-0001-01 - JAMES MULVANEY - Date of Loss: 04/26/2012 - Permanent work restriction

Per the 11/21/13 report of Dr. Bruckman, Mr. Mulvaney has a permanent work restriction to his shoulder indicating that it would be difficult or impossible for him to work at or above the shoulder level indefinitely.

There are no listed work restrictions pertaining to his right fioot or left knee.

I will request that an accomodation be completed to evaluate if there is any permanent modified duties that Mr. Mulvaney can do.

Should you have any questions, please do not hesitate to contact me
Sincerely

Vernon Bennett
Claims Examiner III - Work Comp
Sedgwick Claims Management Services, Inc.
Phone: 866-276-2278
Fax: 866-224-4627
E-mail: Vernon.Bennett@sedgwickcms.com

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

Sedgwick's messaging system has detected that you, as the email recipient, use an email system that supports and enables Transport Layer Security (TLS) email encryption. This message and its contents were transmitted securely to this recipient's email gateway via industry-standard TLS encryption.



Via Certified and Regular U. S. Mail

Hawthorne, CA 90250

June 14, 2016

James Mulvaney
1921 S. Willowcreek Dr.
Tracy, CA 95376

Dear James Mulvaney,

This letter is to inform you of your current employment status with AT&T California (Pacific Bell Telephone Company).

On April 27, 2016, you were notified by the AT&T Integrated Disability Service Center (IDSC) that your Short Term Disability (STD) benefits are not authorized from April 15, 2016.

Since you have not returned to work, you have been on unpaid status for more than thirty (30) calendar days and you are not eligible for FMLA, you have been granted an unpaid Company Initiated Leave (CIL) from April 15, 2016 through June 23, 2016.

The following conditions apply to the CIL:

CIL -
- Upon reinstatement immediately after expiration of this leave, you will be entitled to a maximum of 30 days of service credit once for the entire period of your approved absence from work.
- Employee Benefits - (1) The Company will cease to pay its' contribution for your Medical, Dental, and Vision benefits effective the last day of the month in which the leave begins.  (2) Basic Group Life, (not AD&D), will continue during the leave.  Supplementary and Dependent Group Life Insurance will continue if you enroll prior to the leave start date and you continue to pay for coverage. (3) Contributions to the Spending Account Plan are suspended on the date the leave begins.  (4) Payroll deductions and contributions to the Savings Plan are suspended on the date the leave begins. (5) Participation in the Pension Plan as well as eligibility for death benefit will continue in effect for the period of the leave, subject to the service credit rules. (6) Disability benefits are not provided during any period of the leave.
- The leave will be terminated if you apply for unemployment benefits or accept other employment.
- Important:  This leave is not a guarantee of continued employment or of reinstatement.  The Company reserves the right to terminate this leave at any time to the expiration date.

Refer to the enclosure for additional conditions that apply during the time you are on the CIL.

**Pursuant to information provided by AT&T IDSC, <u>you have not established that you are disabled from work and, to date, you have not returned to work.</u>  Therefore, you must either:**

- Supply medical certification **to me** by no later than June 24. 2016, from your treating physician certifying your disability status.  <u>This certification must be sent **to my attention**</u> via fax at (707) 427-7586. Please note that the medical certification should not include any confidential medical information such as Diagnosis or treatment plan.  Rather what is expected is a note from your treating physician that states you are unable to work and the estimated return to work date.

OR

Report to your regular work location, 7240 Johnson DR., 1st Floor, Pleasanton, CA, ready, willing and able to perform the essential functions of your job as a Splicing Technician on or before June 24, 2016, at 8:00 A.M.  Report to Michael Gile.  His telephone number is (925) 416-8809.  If you need an accommodation to resume your job duties, contact me immediately at (310) 219-7002.

**Failure to comply with one of the above options will result in the termination of your employment with AT&T California (Pacific Bell Telephone Company) on June 24. 2016.**

If you have any questions regarding your benefits, see your Summary Plan Description information or contact AT&T Health and Benefits Enrollment Center (877-722-0020).

This action is separate and apart from, and has no bearing on any claim for Workers' Compensation benefits that you may have.

If you have any other questions regarding your status, please call me on (310) 219-7002.  My fax number is (707) 427-7586.

*Antoinette Carter*

Antoinette Carter
Employee Relations Manager

Enclosure

CC:  Michael Gile, Susan Parker, CWA Local 9412

## Attachment

| PROVISIONS | COMPANY INITIATED LEAVE |
|---|---|
| **Type of Leave** | Discretionary<br>Unpaid |
| **Participating Companies** | See Appendix B |
| **Eligibility** | Regular and term employees, regardless of their length of Net Credited Service, for whom there is a medical dispute about an Employee's ability to work and the Participating Company determines there is a valid reason to place the Employee on a leave.  This leave may also be used for Employees for whom company disability benefits have not been bargained and for whom the Participating Company determines there is a valid reason to place the Employee on the leave. |
| **Requirements** | Complete the appropriate leave of absence application in accordance with the Leave of Absence Application and Approval Process Guide |
| **Purpose** | To provide an unpaid leave of absence to cover periods of absence due to disability for Employees who are not eligible for company disability benefits and have been absent from work for over 30 consecutive days after the initial determination of benefit eligibility |
| **Minimum Duration** | One day (after 30 day waiting period has been satisfied) |
| **Maximum Duration** | Six months (may be extended).  Maximum leave period does not normally exceed 12 months |
| **Job Reinstatement** | Not Guaranteed |
| **Service Credit** | A maximum of 30 days of the total leave period.  Service credit is granted only if Employee returns to work immediately after the expiration of the leave.<br><br>**NOTE:**  An Employee who returns to work from a Company Initiated Leave and who is granted a subsequent Company Initiated Leave within 26 weeks of such return to work shall receive service credit for a maximum of 30 days once for all Company Initiated Leaves combined. |

| PROVISIONS | COMPANY INITIATED LEAVE<br>DESCRIPTION OF BENEFITS |
|---|---|
| **Medical, Dental, Vision** | Medical, Dental and Vision Participating Company-extended coverages are available, subject to regular Participating Company and Employee contributions, as such contributions are applicable and existed immediately prior to the start of the leave, until the end of the month in which the leave begins, then for the duration of the leave COBRA continuation coverage is available |
| **Basic Life & AD&D** | Basic Group Life Insurance (not AD&D Insurance) Participating Company-extended coverage is available during the course of the leave, subject to regular Participating Company contributions. |
| **Supplemental Life & AD&D** | Supplemental Group Life Insurance and Dependent Group Life Insurance Participating Company-extended coverages are available during the course of the leave, subject to the Employee paying the full cost of coverage. |
| **Dependent Child Life & AD&D** | Dependent Child Life and AD&D Insurance Participating Company-extended coverages are available during the course of the leave, subject to the Employee paying the full cost of coverage. |
| **Spouse Life & AD&D** | Spouse Life and AD&D Insurance Participating Company-extended coverages are available during the course of the leave, subject to the Employee paying the full cost of coverage. |
| **Health Reimbursement Accounts** | Healthcare Reimbursement Account funds are available as such funds existed immediately prior to the start of the leave, for the duration of the leave. |
| **Flexible Spending Accounts** | Health Care Flexible Spending Account and the Dependent Care Flexible Spending Account pre-tax deposits cease immediately at the start of the leave; COBRA continued coverage is available for continuation of Health care Flexible Spending Account coverage, including |

deposits on an after-tax basis.

| | |
|---|---|
| **Long Term Care** | Long-Term Care Insurance Participating Company-extended coverage is available subject to the Employee's paying the full cost of coverage. |
| **CarePlus** | CarePlus Participating Company-extended coverage is available, subject to regular Employee contributions, as such contributions are applicable and existed immediately prior to the start of the leave. |
| **Disability** | NA - Employee has an open Short-Term Disability claim that is in dispute. |
| **Savings** | Savings Plan contributions cease at the start of the leave.  Loan repayments will continue through Electronic Transfer or by mail.  Withdrawals and movement of investment balances are permitted |
| **Pension** | Benefit is affected by service credit adjustment, if any, upon return from leave of absence. |

AT&T Proprietary (Internal Use Only)
Not for use or disclosure outside the AT&T Companies except under written agreement.

\*\*While on a leave of absence, an Employee is not eligible for short-term disability benefits under the disability benefits plan of the Employee's Participating Company.



Via Certified and Regular U. S. Mail

San Antonio, TX 78205

July 1, 2016

James Mulvaney
1921 S. Willowcreek Dr.
Tracy, CA 95376

Dear James Mulvaney,

This letter is to inform you of your current employment status with AT&T California (Pacific Bell Telephone Company).

On April 27, 2016, you were notified by the AT&T Integrated Disability Service Center (IDSC) that your Short Term Disability (STD) benefits are not authorized from April 15, 2016.

On June 14, 2016, you were sent a letter advising that since you have not returned to work, you have been on unpaid status for more than thirty (30) calendar days, you are not eligible for FMLA, and that you have been granted an unpaid Company Initiated Leave (CIL) from April 15, 2016 through June 23, 2016.

Based upon information received from AT&T IDSC that extends your disability, your CIL has been extended from June 24, 2016 through September 5, 2016.

The following conditions apply during the time you are on this leave:

<u>CIL -</u>

- Upon reinstatement immediately after expiration of this leave, you will be entitled to a maximum of 30 days of service credit once for the entire period of your approved absence from work.
- Employee Benefits - (1) The Company will cease to pay its' contribution for your Medical, Dental, and Vision benefits effective the last day of the month in which the leave begins. (2) Basic Group Life, (not AD&D), will continue during the leave. Supplementary and Dependent Group Life Insurance will continue if you enroll prior to the leave start date and you continue to pay for coverage. (3) Contributions to the Spending Account Plan are suspended on the date the leave begins. (4) Payroll deductions and contributions to the Savings Plan are suspended on the date the leave begins. (5) Participation in the Pension Plan as well as eligibility for death benefit will continue in effect for the period of the leave, subject to the service credit rules. (6) Disability benefits are not provided during any period of the leave.
- The leave will be terminated if you apply for unemployment benefits or accept other employment.
- **Important:** This leave is not a guarantee of continued employment or of reinstatement. The Company reserves the right to terminate this leave at any time to the expiration date.

Refer to the attachment for additional conditions that apply during the time you are on the CIL.

Additionally, it is your responsibility to provide me with current medical certification from your treating physician if your condition changes or is extended.  The medical certification should state anticipated date of recovery or return to work.

If you have any questions regarding your benefits, see your Summary Plan Description information or contact AT&T Health and Benefits Enrollment Center (877-722-0020).

This action is separate and apart from, and has no bearing on any claim for Workers' Compensation benefits that you may have.

If you have any other questions regarding your status, please call me on (310) 219-7002.  My fax number is (707) 427-7586.

Antoinette Carter
Employee Relations Manager

Enclosure

CC:  Michael Gile, Susan Parker, AT&T IDSC, CWA Local 9412

**Attachment**

| PROVISIONS | COMPANY INITIATED LEAVE |
| --- | --- |
| **Type of Leave** | Discretionary<br>Unpaid |
| **Participating Companies** | See Appendix B |
| **Eligibility** | Regular and term employees, regardless of their length of Net Credited Service, for whom there is a medical dispute about an Employee's ability to work and the Participating Company determines there is a valid reason to place the Employee on a leave.  This leave may also be used for Employees for whom company disability benefits have not been bargained and for whom the Participating Company determines there is a valid reason to place the Employee on the leave. |
| **Requirements** | Complete the appropriate leave of absence application in accordance with the Leave of Absence Application and Approval Process Guide |
| **Purpose** | To provide an unpaid leave of absence to cover periods of absence due to disability for Employees who are not eligible for company disability benefits and have been absent from work for over 30 consecutive days after the initial determination of benefit eligibility |
| **Minimum Duration** | One day (after 30 day waiting period has been satisfied) |
| **Maximum Duration** | Six months (may be extended).  Maximum leave period does not normally exceed 12 months |
| **Job Reinstatement** | Not Guaranteed |
| **Service Credit** | A maximum of 30 days of the total leave period.  Service credit is granted only if Employee returns to work immediately after the expiration of the leave.<br><br>**NOTE:**  An Employee who returns to work from a Company Initiated Leave and who is granted a subsequent Company Initiated Leave within 26 weeks of such return to work shall receive service credit for a maximum of 30 days once for all Company Initiated Leaves combined. |

| PROVISIONS | COMPANY INITIATED LEAVE<br>DESCRIPTION OF BENEFITS |
| --- | --- |
| **Medical, Dental, Vision** | Medical, Dental and Vision Participating Company-extended coverages are available, subject to regular Participating Company and Employee contributions, as such contributions are applicable and existed immediately prior to the start of the leave, until the end of the month in which the leave begins, then for the duration of the leave COBRA continuation coverage is available |
| **Basic Life & AD&D** | Basic Group Life Insurance (not AD&D Insurance) Participating Company-extended coverage is available during the course of the leave, subject to regular Participating Company contributions. |
| **Supplemental Life & AD&D** | Supplemental Group Life Insurance and Dependent Group Life Insurance Participating Company-extended coverages are available during the course of the leave, subject to the Employee paying the full cost of coverage. |
| **Dependent Child Life & AD&D** | Dependent Child Life and AD&D Insurance Participating Company-extended coverages are available during the course of the leave, subject to the Employee paying the full cost of coverage. |
| **Spouse Life & AD&D** | Spouse Life and AD&D Insurance Participating Company-extended coverages are available during the course of the leave, subject to the Employee paying the full cost of coverage. |
| **Health Reimbursement Accounts** | Healthcare Reimbursement Account funds are available as such funds existed immediately prior to the start of the leave, for the duration of the leave. |
| **Flexible Spending Accounts** | Health Care Flexible Spending Account and the Dependent Care Flexible Spending Account pre-tax deposits cease immediately at the start of the leave; COBRA continued coverage is |

|  | available for continuation of Health care Flexible Spending Account coverage, including deposits on an after-tax basis. |
|---|---|
| **Long Term Care** | Long-Term Care Insurance Participating Company-extended coverage is available subject to the Employee's paying the full cost of coverage. |
| **CarePlus** | CarePlus Participating Company-extended coverage is available, subject to regular Employee contributions, as such contributions are applicable and existed immediately prior to the start of the leave. |
| **Disability** | NA - Employee has an open Short-Term Disability claim that is in dispute. |
| **Savings** | Savings Plan contributions cease at the start of the leave.  Loan repayments will continue through Electronic Transfer or by mail.  Withdrawals and movement of investment balances are permitted |
| **Pension** | Benefit is affected by service credit adjustment, if any, upon return from leave of absence. |

AT&T Proprietary (Internal Use Only)

Not for use or disclosure outside the AT&T Companies except under written agreement.

\*\*While on a leave of absence, an Employee is not eligible for short-term disability benefits under the disability benefits plan of the Employee's Participating Company.

Exhibit E

# Tracy Medical Group

530 W. Eaton Avenue, Suite K
Tracy, California 95376
Phone: (209) 835-4232  Fax: (209) 835-3246

| Harpreet Grewal, M.D. | Puneet Grewal, M.D.<br>N.P. | Alice DeLaurier-O'Neil, |

April 14, 2016

To Whom This May Concern:

This is to certify that JAMES MULVANEY has been under my professional care and is/was .

Is medically cleared to do his regular job duties, that he has been doing for the last three years. If you have any questions, please contact our office,

You may call our office for further information upon patient's consent.

Sincerely,

Harpreet S. Grewal MD

JAMES MULVANEY,04/14/2016 11:15 AM ,CP

Unim exhibit 1

Exhibit F

# Robert Z. Bruckman, M.D.

2300 SUTTER STREET, SUITE 304 • SAN FRANCISCO, CA 94115
VOICE: (415) 563-2233   FAX: (415) 563-5311

**Fellow American Academy of Orthopedic Surgeons**

August 5, 2016

## AGREED MEDICAL RE-EVALUATION

Joanna Losee, J.D.
Law Offices of Niloufar Mazhari
5258 Hiddencrest Court
Concord, CA 94521

Bob Canning, Hearing Representative
Sedgwick CMS
P.O. Box 51460
Ontario, CA 91761

| | |
|---|---|
| Re: | JAMES MULVANEY |
| Emp: | Pacific Bell Telephone Company |
| DOI: | CT-04/26/2012; CT-09/15/2012 |
| Claim#: | B325009008; B325009009 |
| WCAB#: | ADJ8885542; ADJ8830069 |

Gentlepersons:

*This report is submitted pursuant to California Code of regulations Title 8, section 9795 as an ML 103-94 and includes 1 hour of face-to-face time with the patient, and at least two hours of review of past medical records, and preparation of report including transcription services. It is noted that complexity is a governing factor. It involves extensive records requiring at least two hours for review, issues of causation, and apportionment of multiple injuries, employers, or body systems and the issue of denial or modification of treatment by the claims administrator following utilization review.*

AGREED MEDICAL RE-EVALUATION
RE:  JAMES MULVANEY

August 5, 2016
Page 2

I had the opportunity to reexamine Mr. James Mulvaney today as an Agreed Medical Evaluator.  I appreciate receiving instructions from Ms. Losee dated April 28, 2016.

Since last seeing Mr. Mulvaney, he has returned to work full-time.  He is currently working without restrictions.   He has no relevant symptoms.   His shoulders function normally, as does his knee and his foot.

PHYSICAL EXAMINATION:

Physical examination reveals that the shoulder now has completely normal range of motion with no soreness or tenderness.  The impingement signs are negative.

Examination of the knee reveals that there is no restriction of range of motion and no restriction of squatting or walking.

Examination of the feet reveals that there is no tenderness and no limp.

REVIEW OF FILE:

The following records were received and reviewed.  These records included, but were not limited to, the following:

1/26/2015 Punee Grewal M.D. Patient has been under care in this office on 1/22 & 1/26/2015.  He is unable to work from 1/26 through 2/2/2015. Diagnosis: muscle spasm & rib contusion. Diclofenac and soma were prescribed.

2/3/2015 Doctors first report of injury. Jagdish Patel M.D. DOI: 1/16/2015. He has an AT&T worker who was in an underground box working on cables to splice it. He was walking & lost his footing. He hit the right side of his chest wall and had pain in the chest, increased with deep breathing. He was given soma to help him sleep which has helped. Diagnosis: acute chest wall trauma. He is encouraged to return to modified duty.

2/3/2015 x-rays of the right rib show no evidence of fracture. Normal radiographs.

6/21/2015 Howard Greils M.D. Psychiatric AME supplemental report. Medical records are reviewed. It is strongly recommended that he be reevaluated as he has not been seen since June 2014 and it appears his emotional condition may have deteriorated . Also the orthopedic AME reports are requested. Dr. Howard Greils initially evaluated Mr. Mulvaney on 10/10/2013. Mr. Mulvaney was injured in April 2011 when he was assigned by his supervisor to assist another

AGREED MEDICAL RE-EVALUATION
RE:  JAMES MULVANEY

August 5, 2016
Page 3

technician. He was told to climb a pole although he felt he did not have adequate training. When he was working on the pole he injured his left shoulder, left knee and on the way down, he fell from a height of 6-8 feet. He had medical treatment. An MRI showed a tear in the left meniscus and a left rotator cuff tear. He underwent surgery on the left shoulder and the left knee followed by rehab. During rehab he noticed depression and anxiety about his injury. He was sent to a psychiatrist. He had another injury in September 2012 when he was stepping out of the work van and had a pop in his left foot. He had treatment. X-rays confirmed the fractured metatarsal. You to previous attendance problems he could not take time off of work or he would face termination. He reported the accident to nis supervisor but did not file a claim for fear of termination.  He continued to work for 3 weeks on the injured foot . He developed plantar fasciitis on the right foot due to favoring . Diagnosis: Axis I: Depressive Disorder NOS. Anxiety Disorder NOS. He had a shoulder injury 3 years ago. He also reports stressors at work. Current GAF = 45-50. It is important to note that the relative weight of the various causal factors in his psychiatric injury and periods of temporary disability have changed over time. During the first time. Nonindustrial factors included distress over his sons drug abuse problems (30%), predisposition for the development of depression due to previously experienced depression in 1995 (10%), residual effects of having an alcohol dependency condition for 14 years that left him more vulnerable to the development of depression (5%). During the 2nd time. His psychiatric temporary disability was predominantly due to the personnel action. Causation at that time was deferred to the trier of fact. In December 2011 he had returned to work without orthopedic restrictions but remained psychiatrically TPD at GAF 65. In the 3rd time. In September 2012 he experienced the fracture to the left foot. This combined with personnel issues past the threshold for predominance of cause. The compensability of this. Psychiatric injury in temporary disability depends on the turn determinations of the trier of fact in concert with the findings of the orthopedic AME. During the 4th time. In December 2012 he had a panic attack. 30% was apportioned to the stress secondary to the ongoing orthopedic pain and limitations, 30% to the applicant's concern secondary to his job security & 40% was apportioned to the combination of a history of alcohol addiction, genetic predisposition for panic disorder, predisposition for depression due to prior history of depression and the stress of his sons addiction problems. Whether this period of time is considered industrial depends on the findings of the orthopedic AME for the orthopedic 30%, and the trier of fact for the personnel action 30%. In conclusion apportionment is as follows: 30% of the 40% is nonindustrial. In conclusion apportionment is related to the stress he experiences psychiatric permanent impairment is related to the stress he experiences secondary to the history of his orthopedic pain and limitations, 25% is apportioned to continued stress secondary to worrying about his job security, and 45% is apportioned to the combination of his alcohol addiction history, and genetic predisposition for panic disorder and depression etc. Dr. Howard Greils states that he would not be able to parcel out the approximate percentages to

AGREED MEDICAL RE-EVALUATION
RE:  JAMES MULVANEY

August 5, 2016
Page 4

which each distinct industrial injury causally contributed to his overall permanent disability. Final GAF is 58. There is no longer a separate diagnosis for sexual dysfunction.

4/14/2016 Harpreet Grewal M.D. he is medically cleared to do his regular job duties he has been doing for the last 3 years.

## DIAGNOSIS:

1. Impingement left shoulder, resolved.

2. Torn medial meniscus left knee, resolved.

3. Fractured second metatarsal neck right foot, resolved.

4. Plantar fasciitis right foot, resolved.

## PERMANENT AND STATIONARY:

Mr. Mulvaney has returned to work following my 2013 letter to the parties.  He has been working without restrictions, and needs none now.

## DISCUSSION:

This section discusses my opinions to a degree of medical probability and avoids speculation or guessing.  I will provide supportive reasoning as necessary so that this report will constitute substantial medical evidence.

Mr. Mulvaney has healed well and returned to normal function.  He may work full-time at any task that is required of him with no restrictions.

To be clear, there are no industrial restrictions that are necessary or that are currently in place.
There is no recommended change in my recommendations of 2013 regarding impairment, apportionment, causation and no further comments on UR.

I appreciate the opportunity to reexamine Mr. Mulvaney.

The face-to-face time spent with the patient was in compliance with the Guidelines per 8 CCR Section 49.

I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except as noted herein, that I believe it to be true.

# Physician's Return-to-Work & Voucher Report

For injuries occurring on or after January 1, 2013

☐ The Employee is P&S from all conditions and the injury has caused permanent partial disability

| Employee Last Name | Employee First Name | MI | Date of Injury |
|---|---|---|---|
| Mulvaney | James | | 04-26-2012 |

| Claims Administrator: | Claims Representative |
|---|---|
| SEDGWICK CLAIMS MANAGEMENT | Weidyne Chau |

**Employer name:**
ADP Total Source, Inc.

**Employer Street Address:**

**Employer City:**

| State | Zip Code | Claim No. |
|---|---|---|
| CA | | B325009008;B325009009 |

☑ The Employee can return to regular work

☐ The Employee can work with restrictions:

| | | 1-2 hours | 2-4 hours | 4-6 hours | 6-8 hours | None |
|---|---|---|---|---|---|---|
| | Stand | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Walk | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Sit | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Bend | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Squat | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Climb | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Twist | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Reach | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Crawl | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Drive | ☐ | ☐ | ☐ | ☐ | ☐ |
| | Reach | ☐ | ☐ | ☐ | ☐ | ☐ |
| R/L/Bilat Hand(s) (circle): | Grasp | ☐ | ☐ | ☐ | ☐ | ☐ |
| R/L/Bilat Hand(s) (circle): | Push/Pull | ☐ | ☐ | ☐ | | |

Lift/Carry Restrictions: May not lift/carry at a height of _____ more than _____ lbs. for more than _____ hours per day.

Other Restrictions:

If a Job Description has been provided, please complete: Job Description provided of: ☐ Regular  ☐ Modified  ☐ Alternative Work

Job Title: _____  Work Location _____

Are the Work Duties compatible with the activity restrictions set forth in the provided job description? ☐ Yes ☐ No, explain below

| Physician's Name | ROBERT Z. BRUCKMAN, M.D. | Role of Doctor (PTP, QME, AME) | QME |
|---|---|---|---|

Physician's Signature _____

Date  AUG 0 5 2016

DWC AD Form 10133.36 (Effective 1/13)

Exhibit G

*Joint Exh 2* *(handwritten)*

***Communications***

LOCAL 9412 (AFL-CIO)
29868 MISSION BOULEVARD
HAYWARD, CALIFORNIA 94544
(510) 581-9412



***Workers of America***

*"The Community-Minded Union"*

## AT&T
### GRIEVANCE MEETING REQUEST
### STEP _1__

DATE: SEPTEMBER 13, 2016

To: **MICHAEL GILE - MANAGER CONSTRUCTION & ENGINEERING**

FROM: **ART BEHNAM – EXECUTIVE VICE PRESIDENT CWA LOCAL 9412**

GRIEVANCE: **AT&T 16-412-027**

A GRIEVANCE HAS BEEN FILLED WITH CWA, LOCAL 9412, ON BEHALF OF THE GRIEVANT NAMED BELOW. I WOULD LIKE TO REQUEST A MEETING AS SOON AS POSSIBLE TO SEE IF WE CAN REACH A SETTLEMENT ON THIS MATTER.

THE FOLLOWING INFORMATION IS BEING PROVIDED IN ACCORDANCE WITH CWA CONTRACT, ARTICLE 7.05 C.I.A.

NAME OF GRIEVANT: **JIM MULVANEY**

NATURE OF GRIEVANCE: MAKE EMPLOYEE WHOLE

DATE OF OCCURRENCE: 9/6/2016

ARTICLE OF CONTRACT/SECTION OR MOA NAME OR NUMBER, DISCIPLINE, DOCUMENTATION, ETC.: ARTICLE 1, 3, 7 AND ANY OTHER THAT MAY APPLY.

SETTLEMENT SOUGHT: REPAY ALL LOST WAGES, HEATHCARE EXPENSES, LOST OF SENIORTY AND MAKE EMPLOYEE WHOLE.

PRIOR TO OUR INITIAL MEETING, PLEASE PROVIDE ME WITH A COPY OF ALL RELATED DOCUMENTS. THIS WILL ALLOW ME THE OPPORTUNITY TO DISCUSS THE DETAILS KNOWLEDGEABLY AND TO HAVE GATHERED ANY NECESSARY INFORMATION FROM THE GRIEVANT.

WE APPRECIATE YOUR COOPERATION.

Exhibit H

*Communications*

**LOCAL 9412 (AFL-CIO)**
29868 MISSION BOULEVARD
HAYWARD, CALIFORNIA 94544
(510) 581-9412



*Workers of America*

*"The Community-Minded Union"*

## AT&T
### GRIEVANCE MEETING REQUEST
### STEP _2__

DATE: OCTOBER 6, 2016

TO: **GREG OWYOUNG - DIRECTOR CONSTRUCTION & ENGINEERING**

FROM: **ART BEHNAM – EXECUTIVE VICE PRESIDENT CWA LOCAL 9412**

GRIEVANCE: **AT&T 16-412-027**

A GRIEVANCE HAS BEEN FILLED WITH CWA, LOCAL 9412, ON BEHALF OF THE GRIEVANT NAMED BELOW. I WOULD LIKE TO REQUEST A MEETING AS SOON AS POSSIBLE TO SEE IF WE CAN REACH A SETTLEMENT ON THIS MATTER.

THE FOLLOWING INFORMATION IS BEING PROVIDED IN ACCORDANCE WITH CWA CONTRACT, ARTICLE 7.05 C.I.A.

NAME OF GRIEVANT: **JIM MULVANEY**

NATURE OF GRIEVANCE: MAKE EMPLOYEE WHOLE

DATE OF OCCURRENCE: 9/6/2016

ARTICLE OF CONTRACT/SECTION OR MOA NAME OR NUMBER, DISCIPLINE, DOCUMENTATION, ETC.:
ARTICLE 1, 3, 7 AND ANY OTHER THAT MAY APPLY.

SETTLEMENT SOUGHT: REPAY ALL LOST WAGES, HEATHCARE EXPENSES, LOST OF SENIORTY, LOST OF PENSION AND MAKE EMPLOYEE WHOLE.

PRIOR TO OUR INITIAL MEETING, PLEASE PROVIDE ME WITH A COPY OF ALL RELATED DOCUMENTS. THIS WILL ALLOW ME THE OPPORTUNITY TO DISCUSS THE DETAILS KNOWLEDGEABLY AND TO HAVE GATHERED ANY NECESSARY INFORMATION FROM THE GRIEVANT.

WE APPRECIATE YOUR COOPERATION.

Exhibit I

 at&t

Jeff Robertson
Lead Labor Relations Manager
Labor Relations

AT&T Services, Inc.
5001 Executive Parkway
Room 2W850
San Ramon, CA 94583
925-823-5529

RECEIVED
MAY  3 2017
DISTRICT 9

SENT VIA E-MAIL AND CERTIFIED US MAIL

May 2, 2017

Lynn Johnson
Staff Representative
Communications Workers of America / District Nine
2804 Gateway Oaks Drive Ste. 150
Sacramento, CA, 95833-4324

Re: Final Company Position
    Union Grievance #: B17001-9412
    Local Grievance #: 16-412-027
    Grievant: James Mulvaney
    Issue: False Information Provided by IDSC

Dear Lynn,

This serves as the final Company position letter regarding the above referenced grievance.

Company rationale: The Company's actions related to Mr. Mulvaney were appropriate based on his self identification of permanent work restrictions that prevented his being able to perform the essential functions of his job.

Company position: This grievance is denied.

Yours truly,

Jeff Robertson

cc: Joanne Chan

Exhibit J

**Communications**
**Workers of America**
AFL-CIO District 9

2804 Gateway Oaks Drive, Suite 150
Sacramento, CA 95833-4324
Tel 916-921-4500 * Fax 916-921-4559

Thomas Runnion
Vice President



**VIA EMAIL ONLY**

May 31, 2017

Ms. Joanne Chan, Director
AT&T Labor Relations
5001 Executive Parkway, Rm 2W950
San Ramon, CA  94583

       Re:     CWA Arb. No: 9-17-10
                Union grievance #: B17001-9412 (16-412-027)
                Grievant: James Mulvaney
                Issue: False Information Provided by IDSC

Dear Ms. Chan:

In accordance with the provision of Article 7.10D of the current contract between the Communications Workers of America and AT&T/SBC/Pacific Bell, I hereby notify you of the Union's intent to proceed to arbitration on the above-referenced grievance.

Please contact Lynn Johnson to confirm the selection of the arbitrator and to schedule the arbitration.

It is the Union's position at this level that the Company unjustly sent Mr. Mulvaney home without pay predicated on false information provided by the IDSC.

The remedy requested by the Communications Workers of America in this particular case is as follows:

    1.   Repay all lost wages all healthcare expenses, lost seniority, lost pension, remove all pertinent documentation and make employee whole.

Sincerely,

Ameenah Salaam, Assistant to the Vice President
CWA District 9

AS/nb
*OPEIU-29-AFL-CIO (233)* cc:

cc:    Lynn Johnson, CWA Staff Representative
       Cathy Seiler, Support Staff

*Rev .3/31/16*

Exhibit K

**KATHERINE J. THOMSON**
Arbitrator
El Cerrito, California
(510) 528-3005 (Phone and FAX)

Arbitrator's Case No. 454-OLC

CWA Case No. 9-7-10

### IN ARBITRATION PROCEEDINGS PURSUANT TO
### AGREEMENT BETWEEN THE PARTIES

**In the Matter of a Controversy between**

**COMMUNICATIONS WORKERS OF AMERICA,
LOCAL 4912, AFL-CIO,
Employee Organization,**

    **and**

**PACIFIC BELL TELEPHONE COMPANY,
Employer,**

**Involving,    James Mulvaney.**

| **ARBITRATOR'S**
| **OPINION AND AWARD**
|
| September 25, 2018

APPEARANCES:

On behalf of the Employee Organization:

        Antonio Ruiz
        Weinberg Roger & Rosenfeld
        1001 Marina Village Parkway Suite 200
        Alameda, CA 94501
        (510) 337-1001

On behalf of the Employer:

        J. Michael Nave
        AVP - Senior Legal Counsel
        AT&T Services Legal Department
        1215 K Street, Suite 1800
        Sacramento, CA 95814
        (916) 341-3440

This arbitration involves the grievance of James Mulvaney. It arises pursuant to the agreement between the Pacific Bell Telephone Company (AT&T), hereinafter the Company or Employer, and the Communications Workers of America, Local 9412, hereinafter the Union, under which KATHERINE J. THOMSON was selected as Arbitrator pursuant to Section 7 of the contract between the parties.

The parties had full opportunity to call witnesses and present evidence and argument during an evidentiary hearing, which was held in San Ramon, California, on September 18, 2018. Witnesses were sworn. The parties did not have a transcript of the proceeding prepared. The record was closed on September 18, 2018, when the Arbitrator heard the parties' oral arguments, and the matter was submitted for decision. The parties agreed that the arbitration would proceed under the Expedited Arbitration Procedure set forth in Section 7.15 of the collective bargaining agreement.

The Company did not stipulate that the matter was properly at arbitration. It advanced both a substantive and a procedural arbitrability claim. As a result, the Arbitrator is addressing only the arbitrability issues in this award, but retains jurisdiction over the matter to decide the merits if appropriate.

## STATEMENT OF THE ISSUE

The parties stipulated at the hearing to the following statement of the issue to be determined:

Whether the Union's notice of intent to arbitrate sets forth an issue that is subject to arbitration?

The Union also proposed another issue to which the Company would not agree, as it argued in part that the Union's substantive issue as stated in the grievance was not subject to arbitration. The Union's proposed issue is:

Did the Employer violate the collective bargaining agreement when it failed to pay the Grievant back pay and benefits for company-initiated leave? If so, what is the appropriate remedy?

2

## RELEVANT CONTRACT LANGUAGE

The parties' collective bargaining agreement, effective 2016 through 2020 (Joint Exhibit 1), stated in relevant part:

## ARTICLE 3

Section 3.09    NON-DISCRIMINATION

A.  In a desire to restate their respective polices, neither the Companies nor the Union shall unlawfully discriminate against any employee because of such employee's race, color ... or because the person is disabled ....

## ARTICLE 7 – PROBLEM RESOLUTION PROCEDURES

### Section 7.03- COMMUNICATION AND PROBLEM SOLVING

We must initiate communication to prevent problems as most problems can be prevented through timely, open and honest communication.

...

C. When a Union representative identifies an issue or dispute in the work area, he or she will interact with the appropriate manager in the work area. An effort should be made by both parties to resolve the problem.

### Section 7.04 - UNION PRESENTATION

The grievance procedure is designed to provide a timely, energy effective way of insuring equality and fairness in resolving disputes which have not been resolved through informal efforts. The Companies and the Union agree that it is their objective to resolve all grievances at the lowest level.

The presentation of a grievance must be made in writing as described in Section 7.05.E1a and in accordance with the time limitations specified below to be eligible for handling under the provisions of Sections 7.05 and 7.09:

A.    Grievances concerning the impact of new, changed or deleted methods and/or procedures intended for department-wide application must be presented within sixty (60) calendar days
      ...

B.    All other grievances must be presented within thirty (30) calendar days from the first occurrence of the action or within thirty (30) calendar days from the date of discovery.

### Section 7.05 - GRIEVANCE PROCEDURE

In keeping with the Companies' and the Union's objective to resolve all grievances at the lowest level, an employee may present his or her grievance to a Union representative who will process it according to the following:

. . .

B.    A grievance involving matters other than discipline will be presented as follows:

1.    Step 1 – To the manager who approved the action. Two (2) paid Union representatives designated by the Local may attend this meeting. If the grievance is not resolved, it will be referred to:

2.    Step 2 – The next level of management above the manager who heard the grievance at Step 1 (no lower than District level or higher than Department Vice President or equivalent title/skip level organizations) and Local President or either of their designated representatives. ...

...

E.    Step I Grievances will be processed according to the following method:

   1.    Prior to the Step I meeting

         a. The Union's written presentation of the grievance to management will include the nature of the grievance; the date of the occurrence; the contractual article/section alleged to have been violated, if applicable, or if not applicable, the source of the alleged violation (e.g. MOA name or number, discipline, documentation); the name of the grievant; and the remedy sought. Presentation must be made in accordance with the time limits stated in Section 7.04.

         b. Management will provide the Union with any information and/or reasons used as a basis for the grieved action no later than ten (10) calendar days following presentation of the grievance....

   2.    Holding the Step I Meeting

         a. Management will hold the meeting within fifteen (15) calendar days following presentation of a grievance.

         ...

   3.    Following the Step I Meeting

         a. Management will inform the Union of the Company's position and rationale at the conclusion of the Step I meeting.

D.    Step II grievances will be processed according to the following method:

   1.    Prior to the Step II Meeting

         a.    The Union will notify the Company in writing of its intent to escalate the grievance to Step II within thirty (30) calendar days following the Step I meeting. ....

         b.    ...

   2.    Holding the Step II Meeting

         a.    Management will hold the Step II grievance meeting within thirty (30) calendar days of receipt of the Union's written intent to escalate the grievance.

         b.    ...

   3.    Following the Step II Meeting

         a.    Management will send the Step II Company position to the Union and the appropriate Labor Relations Director, in accordance with Section 7.07, at the final disposition of the Step II meeting for grievances involving issues other than dismissal.

   . . .

## Section 7.06 - SHARING INFORMATION

A.    During the Step I meeting, the Companies and the Union will identify appropriate areas of concern. During Step I and II meetings, the Companies and the Union will share facts deemed relevant to the grievance by either party.

...

## Section 7.07 - COMPANY POSITION

The Step II ... Company position (as described in 7.05E3 and 7.05F3) shall be sent by certified mail to the National and Local Union in writing within five (5) calendar days of the final Step II ... grievance meeting. A copy will also be sent to the appropriate Labor Relations Director.

Section 7.08 – UNRESOLVED UNION PRESENTED GRIEVANCES

Any grievance not resolved under Subsections 7.05A and 7.05B may be taken to arbitration under the provisions of Sections 7.10 or 7.15.

...

Section 7.10 – ARBITRATION PROCEDURES

Arbitration cases should be minimal due to effective use of the Problem Resolution Procedures. Arbitration should result in timely awards.

A.       If the Union is not satisfied with the Companies' decision at the final meeting in the grievance procedure, the Union may request that the grievance be arbitrated.

. . .

C.       The National Union will notify the Labor Relations Director, in writing, of its desire to meet on the grievance within thirty-five (35) calendar days of receipt of the Step II or Step III Company position letter as described in Section 7.07 above. The meeting between Labor Relations and the National Union will be held within fifteen (15) calendar days of receipt of the written notice. The National Union may elect to waive this meeting and, within the same thirty-five (35) calendar day limit, notify the Companies of its intention to arbitrate the grievance as specified in 7.10D below. If the Union fails to send either written notice within the time limit stated ... and no mutual agreement to extend the time limit has been reached, the grievance will be considered withdrawn from the grievance process.

D.       The Labor Relations Director, or designated representative, will send the final Company position letter to the National Union within five (5) calendar days of the National Union/Labor Relations meeting. Within thirty (30) calendar days following the National Union's receipt of the Companies' final position letter, as described in this section 7.10D, the Union will notify the Companies in writing of its intention to arbitrate the grievance. This notice will specify the issues involved in the grievance and remedy requested. Specifically it will clarify the Union's original written presentation of the grievance to management. This clarification will define the nature of the grievance; the date of the occurrence; the contractual article/section alleged to have been violated, if applicable, or if not applicable, the source of the alleged violation (e.g. MOA name or number, discipline, documentation); the name of the grievant; and the remedy sought for the purposes of arbitration, expedited arbitration and mediation.

...

Section 7.12 – POWER OF THE ARBITRATOR

A.       The Arbitrator has no authority to add to, subtract from, or otherwise modify the provisions of the Contract.

Section 7.13       ARBITRATOR'S DECISION

...

B.       All decisions within the power of the Arbitrator will be final and binding on the parties.

## FACTUAL SUMMARY

The following factual summary may not reflect testimony that is not relevant to the arbitrability issues. It may be expanded in any decision on the merits.

The Grievant is a cable splicing technician who has worked for the Company for 21 years. In March 2016, he signed a workers compensation settlement, which was not entered into the arbitration record. The settlement was based on an Agreed Medical

5

Evaluation dated November 2013 by Agreed Medical Examiner Dr. Bruckman.

(Employer Ex. 1) That report stated in the "Return to Work" section,

> Mr. Mulvaney has returned to work. He is transferring to a new work group
> within Pacific Bell and expects to be able to use a bucket rather than to actively
> climb poles. This will enable him to continue to work indefinitely.
>
> Mr. Mulvaney has occasional aching in his shoulder. The range of motion is ...
> basically within normal limits. The impingement signs remain negative.
>
> Nevertheless, the fact that he has experienced an episode of impingement, treated
> surgically will make it difficult or impossible for him to work at or above
> shoulder level indefinitely.

On April 6 or 7, 2016, the Grievant reported to work at the Pleasanton crew room,

where he had been assigned for the previous three years. His supervisor, Mike Giles, was

on vacation. The lead employee, Joe Bonadona, told him that he was being assigned to a

one-year project in San Jose that would require a week of training. The Grievant testified

that he responded that he was not sure if the new work was within his job description and

within his work restrictions. He expressed concern that the Company had not asked for

volunteers or assigned the work by seniority. He explained that he had recently signed off

on a workers compensation settlement. He asked to talk to a union representative.

Construction Manager Dan Vales came to talk to the Grievant, who reiterated his

concerns and requested a union representative. While the Arbitrator will not resolve

conflicts over the different versions of various conversations that day at this stage of the

arbitration, Vales asked the Grievant if he was refusing to work. The Grievant said he

was not refusing, but wanted to speak to a Union representative. The Grievant called

Union representative Art Benham, who said he did not know about the work and would

arrive in 30 minutes. Before Benham arrived, Vales and another supervisor asked him

more questions about his restrictions and whether he was refusing to work and then sent

him home.

On April 7, Vernon Bennett, Sedgwick[1] workers compensation claims examiner,

had communications with Vales and Area Manager Scott Gonzaga concerning Vales'

---

[1] Sedgwick is a third-party benefits administrator.

conversation "yesterday" with the Grievant, the Grievant's work restrictions, and Gonzaga's assertion that the department would not be able to accommodate the Grievant's restrictions. (Er. Ex. 3) Bennet stated that the Grievant "has a permanent work restriction to his shoulder indicating that it would be impossible for him to work at or above the shoulder level indefinitely." (Er. Ex. 3, p. 3)

Benham and the Grievant met with the Grievant's supervisor, Mike Giles, on the following Monday. Giles had talked to either higher management employees or the Company's third-party workers compensation administrator before the meeting. Although the Grievant told Giles that he had no restrictions, Giles told him he needed proof that he was cleared for full duty.

The Grievant obtained clearance on April 14, 2016, from Dr. Grewal, his treating physician, who was also his workers' compensation doctor. It stated that he was medically cleared to do the regular job duties that he had been doing for the previous three years. (Union Ex. 1) He provided it to Giles. However, the AT&T Integrated Disability Service Center (IDSC) notified the Grievant that it would not accept Dr. Grewal's clearance, since his workers compensation case was settled based on a report from the AME, Dr. Bruckman.

The IDSC is a third party benefits administrator managed by Sedgwick Claims Management Services. It handles disability claims, workers compensation, the return to work process, workplace restrictions, job accommodation, and leave for AT&T employees. (Er. Ex. 4)

After the Grievant consulted with his workers' compensation attorney, he requested a clearance from the workers compensation Agreed Medical Examiner, Dr. Bruckman. Dr. Bruckman did not re-examine the Grievant until August 5, 2016. In the meantime, the Grievant's attorneys requested that Dr. Bruckman clarify his 2013 report to specify work restrictions. (Er. Ex. 2) There is no evidence he responded.

In the meantime, the Company placed the Grievant on company-initiated leave. In a letter dated June 14, 2016, the Company informed the Grievant that that he was not

7

eligible for FMLA leave, but that he had been granted an unpaid Company Initiated
Leave from April 15 through June 23. It listed the changes in benefits that had occurred.
The letter (Un. Ex. 2) stated in part,

> Pursuant to information provided by AT&T IDSC, you have not established that
> you are disabled from work and, to date, you have not returned to work.
> Therefore, you must either: supply medical certification to me by no later than
> June 24 … OR report to your regular work location … Pleasanton CA ….
>
> This action is separate and apart from, and has no bearing on any claim for
> Workers' Compensation benefits that you may have.

On July 1, the Company sent Grievant a letter notifying him that, "Based on
information received from AT&T IDSC that extends your disability, your CIL has been
extended from June 24, 2016, through September 5, 2016. Again the letter stated the
action was separate and apart from workers compensation benefits. (Un. Ex. 3)

On August 25, 2016, Dr. Bruckman sent his Agreed Medical Reevaluation to the
Grievant's attorney and the representative for Sedgwick CMS, the contracting entity that
administrates AT&T's workers compensation matters. (Un. Ex. 4) The report stated that
the Grievant had no relevant symptoms; his shoulders functioned normally. It continued,
"Physical examination reveals that the shoulder now has completely normal range of
motion with no soreness or tenderness. The impingement signs are negative." (p. 2)

In a section entitled "Permanent and Stationary," the report noted that the
Grievant had been working without restrictions and needed none. Specifically, Dr.
Bruckman wrote,

> Mr. Mulvaney has healed well and returned to normal function. He may work
> full-time at any task that is required of him with no restrictions./ To be clear, there
> are no industrial restrictions that are necessary or that are currently in place./
> There is no recommended change in my recommendations of 2013 regarding
> impairment ….

On September 6, the Grievant returned to work in Giles' department. Giles
conducted a return to work interview after receiving notification from IDSC that the
Grievant was to return to full duties full time on September 6, 2016 (Un. Ex. 6). He asked
the Grievant when he made his supervisor aware of his permanent work restrictions

8

identified in 2013. The Grievant replied he did not think he needed to tell his supervisor because he thought management already knew. He explained that he had not been on any climbing assignments on poles and only on three manhole set-ups where climbing a ladder was necessary. He denied making any statement about being surprised that it "took this long for the restrictions to catch up" to him. (Un. Ex. 5)

On September 15, 2016, Sedgwick sent notification to Giles that the Grievant had returned to full duties full time on September 23, **2013**. (Un. Ex. 7)

The Grievant was not paid any benefits or salary by AT&T during his Company-initiated leave and had to continue medical benefits at his own expense under COBRA.

**The Grievance**

The Local Union's Executive Vice President, Art Benham, filed a grievance on September 13, 2016, alleging violations of Articles 1, 3, 7 and "any other that may apply." It indicated that the date of occurrence was September 6, 2016, and the nature of the grievance was to "make employee whole" and sought as a settlement, "repay all lost wages, heathcare (sic) expenses, lost of (sic) seniority and make employee whole." (Jt. Ex. 2) The parties stipulated that their representatives met at Step 1, but there was no testimony about the discussion at the meeting.

Benham filed a Step II grievance with Director of Construction and Engineering Greg Owyoung on October 6, 2016. The content of the written grievance was the same as in Step 1. (Jt. Ex. 2, p.2)

The parties stipulated that their representatives met at Step II. Benham was accompanied by Keith Gibbs, also from Local 9412. AT&T Senior Specialist-Technical Process and Quality Susan Parker, Area Manager of Construction Scott Gonzaga, and Engineering, and Greg Owyoung represented the Employer. Although Benham, Gibbs, Parker and Gonzaga attended the arbitration hearing, no one testified about the Step II grievance meeting.

There is no evidence whether the parties met at the National Union-Labor Relations level. The next document in the grievance process is the May 2, 2017, "Final Company Position" letter from AT&T Lead Labor Relations Manager Jeff Robertson to Lynn Johnson, Staff Representative of CWA, District 9. (Jt. Ex. 2, p.3) The letter identified the issue as "False information provided by IDSC." In it, the Company denied the grievance because, "The Company's actions related to Mr. Mulvaney were appropriate based on his self identification of permanent work restrictions that prevented his being able to perform the essential functions of his job." (Jt. Ex. 2, p.3)

On May 31, 2017, the Union sent a letter to AT&T Labor Relations Director Joanne Chan notifying the Company of its intent to arbitrate. (Jt. Ex. 2, p.4) It repeated the issue's description as "False Information Provided by IDSC." It stated the Union's position that "the Company unjustly sent Mr. Mulvaney home without pay predicated on false information provided by the IDSC," and requested a remedy for lost wages, healthcare expenses, lost seniority and pension, and removal of "pertinent documentation." (Jt. Ex. 2, p.4)

## POSITION OF THE EMPLOYER

The arbitration demand states no grievance that is arbitrable. The dispute is governed by workers compensation law and procedures under the exclusive jurisdiction of the Workers Compensation Appeals Board.

Section 5.07.B of the contract excludes from arbitration any dispute relating to the Plan for Employee's Pensions, Disability Benefits and Death Benefits or the administration of the Plan.

The grievance documents do not state a grievance that is subject to arbitration. The grievance did not identify any wrongdoing. The issue that was later identified—false information from IDSC—is a workers compensation issue. The allegedly false information is the work restriction, a workers' compensation issue. The notice of intent to arbitrate did not even list a contract section alleged to have been violated.

The new Union issue, disability discrimination, was not raised at Step 1 or 2 or in the arbitration demand.

The Union's discrimination claim should have been brought under Labor Code Section 132 (a). The Arbitrator cannot award remedies that the Grievant should have received under workers compensation law.

The Company did nothing wrong. Two Company witnesses testified the Grievant said he could not do the assignment because of his work restrictions. Whether those restrictions were correct can only be determined by the AME.

The grievance should be denied as not arbitrable.

## POSITION OF THE UNION

The Company discriminated against the Grievant on the basis of perceived disability when it placed him on uncompensated company-initiated leave. The Grievant was not disabled.

The grievance is arbitrable. Article 3 was cited in the grievance process. Section 3.09 prohibits discrimination on the basis of disability.

In April 2016, the Employer took the position the Grievant was disabled and placed him on leave based on the 2013 AME. But the AME did not specify any work restrictions, so there is no workers compensation issue.

The Employer's wrong decision caused the Grievant's monetary losses, which the Employer did not cover when it realized the Grievant had no restrictions.

## DISCUSSION

The Company has raised two arbitrability objections to this arbitration. The Company argues that the grievance is substantively not arbitrable because the matter is governed by workers compensation laws and procedures. The Company has the burden to prove that the matter is not arbitrable. "An order to arbitrate a particular grievance should

11

not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers v. Warrior and Gulf Navig. Co.,* 363 U.S. 574, 582 (1960) The question of substantive arbitrability is decided without delving into the merits of the grievance.

The collective bargaining agreement does not restrict grievances to matters alleging "misapplication or misinterpretation" or violation of its provisions. It has a broad definition of a grievance. It plainly allows grievances to be filed and arbitrated over "the contractual article/section alleged to have been violated, if applicable, or **if not applicable**, the source of the alleged violation (e.g. MOA name or number, discipline, documentation)." (emphasis added) The source of the grievance can be a Company action under this broad clause. Therefore, the fact that the Union grieved the Company's failure to make him whole on September 6, 2016 does not exclude the dispute from the grievance and arbitration process. In addition, the Union identified Articles 1 (Recognition), 3 (Company-Union Relations), and 7 (Problem Resolution Procedures) as the basis for its grievance.

The evidence is that the parties discussed the grievance at Steps 1 and 2 and fleshed out the facts relating to the grievance, as provided in Section 7.06.A. The Company's final position shows the Company knew at a minimum that the grievance was alleging that false information from the IDSC led to its actions, which deprived the Grievant of compensation. It was asserting the actions it took were based on the Grievant's work restrictions. This information was confirmed in the arbitration demand which specified that the Company "unjustly sent [the Grievant] home without pay predicated on false information from the IDSC." For the reasons discussed above, the dispute as defined at this level is within the scope of the Section 7.05.E.1.a, even if there are no contractual violations cited.

At the arbitration hearing, the Union focused its arguments on its claim under Section 3.09 that the Company discriminated on the basis of perceived disability when it

12

sent the Grievant home. The Company has pointed to nothing in the collective bargaining agreement that excludes discrimination claims from arbitration.

The Company contends that the Union's discrimination claim should have been filed with the Workers Compensation Appeals Board under Labor Code Section 132a.[2] But that section applies to discrimination based on filing a claim for workers compensation or receiving a rating, award or settlement of a workers compensation claim. That is not the cause of discrimination that the Union claimed in this grievance and arbitration procedure. It claimed disability discrimination.

The Employer argues that Section 5.07.B of the contract excludes from arbitration any dispute relating to the Plan for Employee's Pensions, Disability Benefits and Death Benefits or the administration of the Plan. However, the grievance did not mention the Plan, and there is no evidence that the parties discussed the Plan during the grievance process. No copy of the Plan is in evidence.

The root of the Employer's substantive arbitrability argument is that the issues raised are ones that must be decided with reference to the workers compensation case or within the workers compensation arena. However, that cannot be determined without delving into the merits. Even a preliminary glance at the evidence shows that it is not clear that workers compensation has jurisdiction over all the issues that may govern the outcome. For example, Miriam Castro, an employee of Sedgwick, testified that the

---

[2] That section states in part:

It is the declared policy of this state that there should not be discrimination against workers who are injured in the course and scope of their employment.

(1)     Any employer who discharges, or threatens to discharge, or in any manner discriminates against any employee because he or she has filed or made known his or her intention to file a claim for compensation with his or her employer or an application for adjudication, or because the employee has received a rating, award, or settlement, is guilty of a misdemeanor and the employee's compensation shall be increased by one-half, but in no event more than ten thousand dollars ($10,000), together with costs and expenses not in excess of two hundred fifty dollars ($250). Any such employee shall also be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer.
...
Proceedings for increased compensation as provided in paragraph (1), or for reinstatement and reimbursement for lost wages and work benefits, are to be instituted by filing an appropriate petition with the appeals board, but these proceedings may not be commenced more than one year from the discriminatory act or date of termination of the employee. The appeals board is vested with full power, authority, and jurisdiction to try and determine finally all matters specified in this section subject only to judicial review

13

Workers Compensation Appeals Board is not involved with whether employers may place injured employees on leave. And letters from the IDSC (Union Exhibits 1 and 2) indicate the leave decisions were separate from workers compensation benefits rulings or settlements.

In sum, the grievance as presented at various levels of the process is substantively arbitrable. This does not mean that the Employer may not defend the allegations based on workers compensation evaluations, just that the merits of the Union's grievance is not excluded from arbitration by the parties' collective bargaining agreement.

The Company also contends that the disability discrimination issue is not properly at arbitration since it was not specified in the grievance or letter of intent to arbitrate. Again, the Company has the burden to show that the issue is not procedurally arbitrable.

There is some evidence that the discrimination issue may have been encompassed in the original grievance, as Article 3 was cited and the Employer did not present evidence that discrimination was not discussed during grievance meetings. More importantly, Section 7.10.D has requirements for the notice of intent to arbitrate. The Union is required to clarify the "original written presentation" to management and set forth certain information, such as the nature of the grievance and contractual article violated, if applicable. Thus, the Union is limited to the issues it set out in the notice of intent to arbitrate. Here that issue is, "Did the Employer unjustly send the Grievant home without pay predicated on false information provided by the IDSC?" That issue is broad enough to include alleged discrimination and other unjust reasons for the Company's placement of the Grievant on Company-initiated leave without pay. As discussed above, that issue is a proper subject of arbitration under the broad conception of grievance in the collective bargaining agreement.

## AWARD

The Union's notice of intent to arbitrate sets forth an issue that is subject to arbitration.

DATE: September 25, 2018.

Katherine J. Thomson, Arbitrator

14